**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE:

PETER HENDRIK BOS, JR., and      Case Nos.:   15-30922-KKS
LEGENDARY HOLDING, INC.,                        15-30923-KKS
                                                 Chapter 7 Involuntary
                                                 **JOINTLY ADMINISTERED**

Alleged Debtors.

_____/

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM**
**OPINION ON ALLEGED DEBTORS' MOTIONS TO DISMISS**
**INVOLUNTARY PETITIONS**
**(DOCS. 21 & 15-30923: DOC. 27)[1]**

THIS CASE is before the Court on Chapter 7 Involuntary Petitions filed by

SE Property Holdings, LLC ("SEPH") against Alleged Debtors, Peter H. Bos, Jr.

("Bos") and Legendary Holding, Inc. ("LHI") (collectively the "Alleged Debtors").

Alleged Debtors argue that the petitions should be dismissed because SEPH is the

sole petitioning creditor, each Alleged Debtor has twelve or more qualifying

creditors, and each is generally paying his and its debts as they become due.  In the

alternative, Alleged Debtors argue that this Court should abstain from these

involuntary cases because they involve, *inter alia*, a two party dispute between them

on the one hand and SEPH on the other.

---

[1] The two cases have been jointly administered as Case No. 15-30922 since November 13, 2015 (15-30923:
Doc. 147.)

The evidentiary hearing lasted several days and spanned more than two months.  In rendering this decision the Court has reviewed the parties' motions, briefs and memoranda; has considered multiple *ore tenus* motions by Alleged Debtors; and has taken and considered testimony of numerous witnesses.  The Court has also reviewed significant portions of the more than 15,000 pages of exhibits admitted in evidence.   Upon the totality of the circumstances, having fully considered all of the arguments and evidence, and for the reasons set forth below the Court has determined that it should abstain and dismiss these cases pursuant to 11 U.S.C. § 305(a).

Background

Alleged Debtors

Bos is an individual.  Since 1976 he and companies he has owned, operated or otherwise been affiliated with have developed, built, leased and managed hundreds of millions of dollars' worth of projects comprising over a million  square feet of retail, lodging, residential, restaurant, resort facilities, hotels, drug rehabilitation facilities, marine and mixed-use space along the Emerald Coast of Florida.  Bos is the sole owner and president of LHI.  LHI is a holding company.  It owns a 1% general partner stake and a 47% limited partner stake in Legendary Group, Ltd.  Legendary Group, Ltd., in turn, owns many companies that operate a variety of different businesses.

Bos and LHI's affiliates and subsidiaries, together the "Legendary group," own and operate some of the most well-known properties in the North Gulf Coast of Florida:  Sandestin Golf and Beach Resort, Destin Commons Shopping Center, Regatta Commons Office Park, HarborWalk Village, Emerald Grande, Legendary Marine, Legendary Yacht Club, and Regatta Bay Golf and Yacht Club.  The Legendary group employs over 500 people in Okaloosa County, Florida.

Alleged Debtors assert that those employees' jobs are in jeopardy because of SEPH's filing of the involuntary petitions.  They also claim that the Legendary group of "Companies" is an important part of the Emerald Coast community of Florida, and that the Companies were economically healthy and meeting their obligations as agreed as of the filing of the involuntary petitions.

Bos, Wendy Parker, and Pete Knowles are the corporate officers of LHI.  In addition to being the COO of LHI, Pete Knowles is Vice-President of a number of the Legendary group entities.  Bos is a sophisticated businessman who regularly relies on a team of attorneys, accountants and others.  Bos and his team have made extensive use of corporations, limited liability companies, and various other operating entities. Bos and Pete Knowles testified that this form of doing business—

use of single purpose entities to conduct different businesses—is common among real estate developers.

Alleged Debtors were affected significantly by the economic downturn, called by some the "great recession," that began in 2007-08. In recent years they had been unable to service, curtail, or pay off many loans so they sought and obtained, from all of their lenders but SEPH, workout agreements, loan restructures and forbearance agreements. According to Bos, as of the date SEPH filed the involuntary petitions Alleged Debtors had made peace with thirteen out of fourteen lenders holding $258 million out of a total of $270 million in debt on 27 separate loans; the only creditor that Alleged Debtors have been unable to come to terms with is SEPH.

SEPH's Claim

SEPH's claim originated in 2006 with a loan made by Vision Bank to 213B Development Co., Inc. ("213B"), one of Bos's companies and a member of the Legendary group. Bos and LHI each executed guaranty agreements in favor of Vision Bank. In 2009, after 213B defaulted on this loan and Bos and LHI failed to perform on their guarantees, SEPH filed suit against them in state court.[2] Bos, LHI and 213B responded with multiple affirmative defenses and a counterclaim. At some point apparently Bos and LHI apparently decided to fight SEPH to the death

---

[2] Bos, LHI and 213B stipulated to the execution and delivery of the loan documents and guarantees, and SEPH proved its status as successor by merger to Vision Bank and its standing to sue Bos and LHI to the satisfaction of the state court.

rather than pay its claim. The parties have been unable, or unwilling, to settle.[3] After more than four years of extensive and costly litigation, in October of 2014 the case finally went to a three- day bench trial, resulting in a ruling for SEPH and against Bos, LHI and 213B on all matters. The economic result of this legal battle rendered Alleged Debtors liable to SEPH on a final judgment that more than doubled the amount of SEPH's original claim.[4] To date, neither Bos nor LHI has made any post-judgment payment to SEPH.

SEPH's Filing of the Involuntary Petitions

The spark that ignited SEPH's filing of these involuntary petitions was its post-judgment discovery that Alleged Debtors had granted stipulated "charging orders" to two friendly insider creditors:  SSI Destin LYC 1, LLC ("SSI Destin") and RB GOLF, LLC ("RB Golf").  These charging orders, entered within 90 days of SEPH's filing of the petitions, gave SSI Destin and RB Golf first priority liens on Alleged Debtors' ownership and membership interests in most, if not all, of the Legendary group entities.[5]  Because Bos owns 100% of the stock in LHI, and LHI in turn owns 48% of the Legendary group, the charging orders in favor of SSI Destin

---

[3] The parties twice failed to settle through mediation, even after SEPH filed the involuntary petitions.

[4] Bos and LHI originally owed SEPH just under $7 million.  By the end of the trial and subsequent hearing on attorneys' fees, Bos and LHI owed SEPH $15,005,558.11 on two final judgments that include more than $700,000 in attorneys' fees and costs and 18% default interest.

[5] The charging order(s) issued in favor of RB Golf were vacated after SEPH filed the involuntary petitions because of Alleged Debtors' "discovery" that the debt to RB Golf had been satisfied long ago.  RB Golf is an entity friendly to Alleged Debtors, but because it does not hold a claim it will not be discussed further in this ruling.

resulted, in effect, in SSI Destin's judgment claim being secured by all of Bos and LHI's valuable assets, to the detriment of SEPH.[6]

SEPH's Pre-petition Collection Efforts

SEPH's claim is partly secured by a mortgage on a vacant tract of land in Okaloosa County, Florida, owned by 213B. SEPH's final judgment was in part for foreclosure of the mortgage. As of the date it filed these Petitions, SEPH had not requested a foreclosure sale date. The evidence of the value of this parcel was from SEPH's expert appraiser, who testified that the value of this land as of the filing the involuntary petitions was $2.9 million.[7]

SEPH recorded a certified copy of its final judgment in the Official Records of Okaloosa, Escambia, Walton and Bay Counties, Florida, and filed a Judgment Lien Certificate ("JLC") with the Florida Department of State. By virtue of an uncontested charging order, SEPH's judgment claim became secured by a lien on LHI's interest in Lorna Properties, LLC.[8] Although Alleged Debtors argue that

---

[6] In his Affidavits in opposition to the involuntary petitions, Bos testified: "I collateralized or sold substantially all of my personal assets during the Companies' credit crunch and debt restructuring in the Great Recession. First and second liens exist on my real property, [and referring to the RB Golf and SSI Destin charging orders,] charging orders exist on my limited liability company membership interests, and my corporate shares have been attached."

[7] The Court allowed this evidence in over objection of Alleged Debtors. Alleged Debtors reserved the right to challenge this valuation if the value of this parcel became an issue later in these cases.

[8] This charging order was entered in an Alabama state court as part of SEPH's proceedings supplementary. Alleged Debtors presented no evidence of the value of Lorna Properties, LLC. The fact that Bos and LHI did not contest this charging order leads to the conclusion that they felt Lorna Properties, LLC had little or no value. Otherwise, based on the parties' litigious history, it is safe to assume that Alleged Debtors would have fought this charging order with vigor.

SEPH's recording of the final judgment and JLC rendered SEPH's claim secured by "several liens on real and personal property," the evidence reveals that the opposite is likely true.  The only real property that Bos has a direct ownership interest in is his exempt homestead to which SEPH's judgment did not attach.  The only personal property that either Bos or LHI have disclosed ownership of is comprised of their membership and stock interests in the Legendary group entities.  By the time SEPH recorded its judgment and JLC, all of these assets were fully encumbered by the charging orders entered in favor of SSI Destin and RB Golf.  The record is devoid of evidence that LHI owns any real property to which SEPH's judgment lien could have attached.

SEPH garnished a bank account owned by Bos and his wife.  Bos filed a Claim of Exemption for this account on the basis that he and his wife owned it as tenants by the entireties.  SEPH did not challenge this exemption so the Writ of Garnishment was dissolved.

Procedural History of the Involuntary Petitions

SEPH filed the involuntary petitions on September 4, 2015.  Before filing their motions to dismiss, Bos and LHI filed emergency motions to require SEPH to post an indemnity bond pursuant to 11 U.S.C. § 303(e).  The Court held the initial hearing

on those motions over two days, on October 1 and 5, 2015.[9]  With consent of the parties, the Court considered the Alleged Debtors' later-filed motions to dismiss, along with their *ore tenus* denials of SEPH's allegations, as answers to the petitions.

Initially, Bos filed a list of 39 alleged qualifying creditors.  He then filed an amended list that contained 41 creditors and a second amended list that contained 37 creditors.[10]  LHI initially filed a list of 22 alleged qualifying creditors.  It then filed an amended list of 23 creditors, and a second amended list of 25 creditors.

SEPH has had a reasonable opportunity to seek other creditors to join in the Petition pursuant to 11 U.S.C. § 303(c), but none have.

The issues on these contested petitions were tried on November 18-20, 2015 and January 12-13 and 15, 2016.  The hearing on Alleged Debtors' bond motions was continued indefinitely, pending this ruling.

<u>Alleged Debtors' Rule 15(b) Motion to Amend the Pleadings</u>

At the conclusion of the evidence Alleged Debtors moved to amend their pleadings under Fed. R. Civ. P. 15(b).  First, they requested that their lists of creditors be amended to include, as separate creditors, all entities on the real property tax bills from the Okaloosa County Tax Collector.[11]  Secondly, they requested their pleadings

---

[9] The parties filed and the Court heard various other motions that are not material to this ruling and which will not be addressed here.

[10] Bos moved for leave to file a third amended list adding three additional creditors after the close of the second discovery period and eight days before the continued hearing.  That motion was denied.

[11] Those entities include: Okaloosa County, School RLE, School CAP IMP/DISC, Destin, Water MGMT (the first portion of this entity's name is not visible on the exhibit), and Destin FD.

to be amended to include a denial that SEPH is a qualifying creditor.  The Court is granting this motion; these issues are discussed below.[12]

### Alleged Debtors' Rule 52(c) Motions - Whether SEPH is a Creditor Qualified to file These Involuntary Petitions.

Bos and LHI also moved for judgment on partial findings under Fed. R. Civ. P. 52(c), arguing that SEPH failed to meet its burden to prove that it qualifies as a petitioning creditor.[13]  In support of this motion Alleged Debtors argue that SEPH's recorded final judgment and JLC prove that it has a lien on all of their real and personal property in Florida; that because SEPH did not offer evidence of what real and personal property its liens attached to, or the value of any such property, SEPH failed to meet its burden of proof.[14]  The logic of this argument is flawed and the factual basis for this argument is not supported by the evidence.  The motion for judgment on partial findings will be denied.

A petitioning creditor must hold a noncontingent, undisputed claim that aggregates at least $15,325 more than the value of any lien on property of the debtor

---

[12] Alleged Debtors did not include any taxing authority other than Okaloosa County Tax Collector on any of their creditor lists.  SEPH did not present testimony or evidence on this issue at trial because the matter had not been raised.  Because ultimately this is a legal, and not a factual issue, SEPH will suffer no harm by the Court's granting of this motion.
[13] Fed. R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52).
[14] SEPH's response is that Alleged Debtors waived this argument by not raising it in their answer or motion to dismiss.  SEPH points out that it presented evidence that: 1) its claim exceeds $15 million; 2) the real property that secures the underlying debt is worth only $2.9 million; and 3) Alleged Debtors admitted in their Affidavits that all of their assets were subject to superior liens, charging orders, and attachments as of the date these involuntary petitions were filed, making SEPH's claim a third lien on those assets.

securing such claim.[15] The $15,325 threshold can only be composed of either the under-secured portion of a secured creditor's claim or a totally unsecured claim.[16] Alleged Debtors correctly argue that a petitioning creditor has the burden to prove that it is qualified under 11 U.S.C. § 303(b)(1).[17] SEPH met this burden: it proved by a preponderance of the evidence that it holds an unsecured claim significantly in excess of the current statutory threshold of $15,325.[18] Alleged Debtors cite authority to the effect that SEPH has the burden of proving that all statutory requirements of Section 303 have been met.[19] But there is a dearth of authority, and Alleged Debtors cite none, that discusses what happens when a petitioning creditor meets its initial burden of proof, as has SEPH, and the alleged debtor argues that collateral securing the petitioning creditor's claim has a value such that the under-secured portion of the claim is less than $15,325.

The legal issue most analogous in involuntary cases is which party has the burden of proof on whether a petitioning creditor's claim is subject to a bona fide dispute under 11 U.S.C. § 303(b)(1). Consistent with the majority of cases on that

---

[15] 11 U.S.C. § 303(b)(1) and (2).

[16] 2 Collier on Bankruptcy ¶ 303.12[2], at p. 303-38, 39 (16th ed. 2015).

[17] *See In re DSC, Ltd.*, 486 F.3d 940, 944 (6th Cir. 2007).

[18] 11 U.S.C. § 303(b)(1). The parties stipulated that as of the date it filed the involuntary petitions SEPH held unsatisfied judgments totaling in excess of $15 million.

[19] *In re Palace Oriental Rugs, Inc.*, 193 B.R. 126, 128 (Bankr. D. Conn. 1996) ("Petitioning creditors bear the ultimate burden of proving that all statutory requirements of Bankruptcy Code Section 303 have been met. 2 Collier on Bankruptcy ¶ 303.15[7], at p. 303–80 (15th ed. 1995).").

issue, the Court finds that once SEPH met its initial burden to prove that it holds a qualifying claim, the burden shifted to Alleged Debtors to prove otherwise.

Courts in at least two Circuits and the Northern District of Florida have adopted a burden shifting approach for determining whether a petitioning creditor's claim is subject to a bona fide dispute.[20] In *In re Rimell*,[21] two alleged debtors argued that the petitioning creditors—banks—held claims subject to a bona fide dispute. Alleged debtors asserted that the banks orally agreed, upon one debtor's request, to modify the terms of the loans underlying the banks' claims. In determining whether the claims were subject to a bona fide dispute, the Eighth Circuit held that the petitioning creditor must establish a prima facie case that no bona fide dispute exists. Then, the burden shifts to the debtor to prove the existence of a bona fide dispute. The bankruptcy court noted that the parties did not dispute the amounts due, the genuineness of the loan documents, or the effect of their terms. The bankruptcy court also concluded that there was no oral agreement to modify the loans. The Eighth Circuit found no clear error and sustained the bankruptcy court's ruling.

In adopting the burden-shifting framework, the *Rimell* court relied on *Bartmann v. Maverick Tube Corp.*[22] In *Bartmann,* the 10th Circuit held that the bankruptcy court erred as a matter of law in finding that a post-petition payment to

---

[20] *In re Rimell*, 946 F.2d 1363 (8th Cir. 1991);  *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540 (10th Cir. 1988); *Farmers & Merchants State Bank v. Turner*, 518 B.R. 642 (N.D. Fla. 2014).
[21] 946 F.2d 1363.
[22] 853 F.2d 1540.

one petitioning creditor proved that there was no bona fide dispute as to that creditor's claim.[23]  The Tenth Circuit voiced concern that without a burden-shifting framework a debtor could defeat an involuntary petition by merely asserting that a bona fide dispute exists, which is what Alleged Debtors are attempting here by merely asserting that SEPH's judgment is secured by a lien on real and personal property.

In *In re Speer*,[24] the alleged debtor argued that the involuntary petition should be dismissed because (1) the petitioning creditors' claims were subject to a bona fide dispute or contingent as to liability; (2) she was generally paying her debts as they came due; (3) the involuntary petition was filed in bad faith; and (4) the court should dismiss or suspend the proceedings under the abstention statute.  The court first addressed whether the petitioning creditors' claims were contingent as to liability or the subject of a bona fide dispute.  Relying on Second Circuit precedent the *Speer* court set forth a burden-shifting framework for proving whether a petitioning creditor's claim is subject to a bona fide dispute.  Recognizing that a debt is subject to a bona fide dispute if there is an objective basis for either a factual or legal dispute as to its validity, that court held that the petitioning creditor must establish a prima facie case that no bona fide dispute exists; then, the burden shifts to the alleged

---

[23] The Circuit Court in *Bartmann* also held that the bankruptcy court erred when it determined that a guaranty did not apply to post-guaranty transactions, and did not extend to the successors or assigns of the original beneficiary of the guarantee.  *Id.* at 1546.

[24] 522 B.R. 1 (Bankr. D. Conn. 2014).

debtor to prove the existence of a dispute. [25]  Applying this ruling to the facts before it, the *Speer* court held that all three petitioning creditors held qualifying claims.

Applying the burden shifting approach here, once SEPH met its burden to prove a prima facie case that it holds a qualifying claim, the burden shifted to Alleged Debtors to prove their allegations to the contrary.  Alleged Debtors did not meet their burden.  They failed to prove that SEPH's claim is fully secured, or that the amount of its under-secured claim is less than the statutory threshold for filing an involuntary petition.  SEPH is qualified to be the petitioning creditor.

This ruling is entirely consistent with that in *Farmers & Merchants State Bank v. Turner*. [26]  In *Turner,* three creditors filed an involuntary petition.  A confirmed Chapter 11 plan in a prior case involving the parties contained language conveying assets (real property and stock) to creditors, including the petitioning creditors, one of which was a bank holding a judgment. [27]  The confirmed plan established the value of real property to be conveyed at $1.1 million; this property was conveyed to the bank.  In the involuntary case, all parties were aware of the provisions of the confirmed plan.  The petitioning bank judgment creditor never put forward an

---

[25] *Id.* at 6.  The *Speer* court relied on *In re BDC 56 LLC*, 330 F.3d 111 (2d Cir. 2003) to adopt the burden shifting framework. *In re BDC 56 LLC* also declared that the elements of § 303 of the bankruptcy code are jurisdictional; that part of the decision was abrogated in *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010).
[26] 518 B.R. 642 (N.D. Fla. 2014).
[27] The alleged debtors proved that two of the three petitioning creditors' claims had been satisfied in full with the property conveyed under the confirmed plan.  The remaining claim held by the judgment creditor bank was the subject of the remainder of this Court's decision and the appeal.  *Id.* at 647.

undisputed amount of its claim;[28] rather, it claimed standing to proceed as a petitioning creditor based on the face amount of its judgment without giving a credit for the property it was to receive under the confirmed plan.[29]    This Court held that the judgment creditor bank had made a prima facie case showing that it held a qualified claim that had been reduced to a final judgment, and was not subject to a bona fide dispute as to liability.[30]  This Court then shifted the burden to the alleged debtor, who put on evidence that the judgment was either partially or fully satisfied by the property conveyed pursuant to the plan.  This Court ultimately held that there was a bona fide dispute as to the amount of the petitioning creditor's claim because it could not tell from the evidence whether the claim had been fully satisfied.[31]  The district court affirmed.[32]

SEPH has never disputed that property owned by 213B secures its claim in part.  It introduced expert testimony that the value of that property as of the petition date was $2.9 million.  At that point, SEPH had met its burden to prove that it held a qualifying claim:  the amount of its under-secured judgment claim was still approximately $12 million.[33]  The burden then shifted to Alleged Debtors to prove

---

[28] *Id.* at 650.

[29] *Id.* at 651.

[30] *Id.* at 647.

[31] *Id.*

[32] The District Court held that regardless of any burden shifting, the judgment creditor in *Turner* had not met its statutory requirement of proceeding on a noncontingent, undisputed claim, citing to 11 U.S.C. § 303(b).  *Id.*

[33] The parties stipulated that SEPH's claim, being based on a final judgment from which no appeal was taken, is not subject to a bona fide dispute as to validity or amount.

their allegations that SEPH's judgment lien had attached to other property the value of which was sufficient to reduce its under-secured claim to below the statutory threshold.

The difference between the facts here and those in *Turner* is that here, the Alleged Debtors argue that non-contractual events—SEPH's recording of its final judgment and JLC—rendered SEPH's claim completely secured, or its under-secured claim below the statutory threshold of $15,325. This is where the Alleged Debtors' legal arguments and proof failed. Alleged Debtors proved, and SEPH does not deny, that SEPH recorded certified copies of its final judgment in several Florida counties. Under Florida law the recorded judgment could only attach to real property owned by Bos and LHI. The evidence shows that neither Bos nor LHI own any real property to which SEPH's judgment could have attached. By Alleged Debtors' own admission, LHI is a holding company; its only assets consist of membership interests and stock in separate companies. It owns no real property. Bos's only interest in real property is the homestead that he owns jointly with his wife. Because this is Constitutional homestead, and because SEPH does not have a judgment against Bos's wife, SEPH's judgment cannot have attached to this property. So, although Alleged Debtors proved that SEPH recorded its judgment, they failed to prove that this recording caused the judgment to attach to any real property.

Similarly, Alleged Debtors proved, and SEPH did not deny, that SEPH recorded a JLC.  Under Florida law, a JLC gives a judgment creditor a lien on all personal property subject to execution, other than fixtures, money, negotiable instruments, and mortgages, owned by debtor anywhere in the state.[34]  Stock in corporations is subject to execution but not membership or other interests in LLCs, for which a judgment creditor must obtain a charging order.[35]  SEPH did not execute on any stock owned by either Bos or LHI pre-petition, nor did it obtain a charging order on either of Alleged Debtors' interests in any valuable entities in the Legendary group.[36]  Alleged Debtors did not introduce evidence that either of them owns any personal property to which SEPH's JLC lien attached.  LHI, as a holding company, owns nothing but membership and other interests in separate entities that it had already encumbered by granting charging orders to SSI Destin.  Alleged Debtors produced not a scintilla of evidence that Bos, individually, owns any personal property.[37]  Alleged Debtors, having failed to prove that SEPH's judgment attached to any real or personal property, did not overcome SEPH's *prima facie* showing that the value of its under-secured claim was $12 million.

---

[34] § 55.202(c)(2) & § 56.061 Fla. Stat. (2015).

[35] § 56.061 & § 605.0503 Fla. Stat. (2015).

[36] As noted previously, Alleged Debtors consented to issuance of a charging order in favor of SEPH on Lorna Properties, LLC.  No party put on evidence of the value of that entity.

[37] Bos drives a Mercedes and a BMW owned and paid for by Legendary entities.  Bos' yacht and fishing vessel are also owned and paid for by different Legendary entities.  The Record is devoid of evidence as to any other tangible personal property owned by Bos.

<u>Numerosity-Do Alleged Debtors have fewer than twelve
qualifying creditors?</u>

Having determined that SEPH is qualified to be a petitioning creditor, the next question is numerosity:  whether Alleged Debtors have twelve or more "qualifying creditors."  Bos and LHI have consistently maintained that each of them has twelve or more qualifying creditors.  SEPH concedes that each Alleged Debtor has twelve or more creditors, but disputes that either has twelve or more "qualifying" creditors. The numerosity requirement of the Bankruptcy Code is set forth in 11 U.S.C. § 303(b), which provides:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,325 of such claims . . . .

If the alleged debtor avers the existence of twelve or more creditors, it must file a list of all claimed creditors.[38]  Because both Bos and LHI have done so, the Court must analyze each of listed creditor separately in light of the evidence presented.

Guaranty Claims

In general, some guaranty obligations are contingent and some are noncontingent.  Section 303(b) excludes holders of contingent claims from the numerosity count.  Bos and LHI concede that two of their creditors with guaranty claims, Premier American Bank and Marlin Business Bank, should not be counted because their claims are contingent.  Bos lists eight additional creditors with guaranty claims; LHI lists five such creditors.

The Bankruptcy Code does not define "contingent."  Courts have defined contingent as where "an alleged debtor's legal duty to pay does not come into existence until triggered by the occurrence of an extrinsic event and such extrinsic event or occurrence was one that was reasonably contemplated by the parties at the time the event giving rise to the claim occurred."[39]  The bankruptcy court in *In re All Media Properties, Inc.*[40]described a guaranty as the "classic" example of a

---

[38] Fed. R. Bankr. P. 1003(b).

[39] *In re Whittaker*, 177 B.R. 360 (Bankr. N.D. Fla.  1994); *In re Rosenberg*, 414 B.R. 826, 844 (Bankr. S.D. Fla. 2009).  *See also* 2 Collier on Bankruptcy ¶ 303.10[1], at p. 303-26 (16th ed. 2015) ("[A] claim that is contingent as to liability is one as to which the debtor's obligation to pay does not come into being until the happening of some future event, and that event was within the contemplation of the parties at the time their relationship originated.")

[40] 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980).

contingent liability, provided a thorough discussion of contingent claims, and gave

examples of noncontingent claims:

> [I]n the case of the classic contingent liability of a guarantor of a
> promissory note executed by a third party, both the creditor and
> guarantor knew there would be liability only if the principal maker
> defaulted.  No obligation arises until such default.  In the case of a tort
> claim for negligence, the parties at the time of the alleged negligent
> act would be presumed to have contemplated that the alleged
> tortfeasor would be liable only if it were so established by a competent
> tribunal.  Such a tort claim is contingent as to liability until a final
> judgment is entered fixing the rights of the parties. On the other hand,
> in the ordinary debt arising from, for example, a sale of merchandise,
> the parties to the transaction would not at that time view the obligation
> as contingent. Subsequent events might lead to a dispute as to liability
> because of, for example, defective merchandise, but that would
> merely serve to render the debt a disputed one but would not make it
> a contingent one. A legal obligation arose at the time of the sale,
> although the obligation can possibly be avoided. Such a claim is
> disputed, but it is not contingent. . . .  Likewise, an unmatured
> obligation is not contingent as to liability. The obligation to pay
> existed from the outset; no outside event is necessary to bring the
> obligation into existence, but rather the obligation may be
> extinguished by payment. This does not render such a debt
> "contingent as to liability", but renders it only "unmatured". [41]

Whether a guaranty is absolute or conditional, "the happening of some future

event" is necessary to trigger liability.[42]  That "future event" may be as simple as a

borrower's failure to pay or a demand for payment on the guarantor.[43] In order to

---

[41] 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980) *aff'd*, 646 F.2d 193 (5th Cir. 1981) (the opinion's discussion of contingent claims has been cited at least 91 times by courts all across the country).

[42] 2 Collier on Bankruptcy ¶ 303.10[1], at p. 303-26 (16th ed. 2015).

[43] *See, e.g.*, *In re Stewart*, No. 14-03177, 2015 WL 1282971, at *3 (Bankr. S.D. Ala. Mar. 18, 2015) (noting that "no demand" had been made on the guarantees); *Rosenberg*, 414 B.R. at 844 (Bankr. S.D. Fla. 2009) (noting that a demand for payment must be made before liability matures under the guaranty).

determine whether a guaranty obligation is or is not contingent we look to the written guaranty and the facts surrounding each guaranty claim.  In this case, doing so leads to the conclusion that the remainder of the creditors holding guaranty claims listed by Bos and LHI should not count for numerosity.

Guarantees containing "<em>ipso facto</em>" clauses

An *ipso facto* clause (the Latin phrase meaning "by the fact itself") is commonly a provision that makes the bankruptcy or insolvency of one contracting party a trigger for the other party to terminate the contract.  Certain creditors listed by both Alleged Debtors hold claims based on guarantees containing *ipso facto* clauses.  Alleged Debtors argue that these guaranty creditors should count for numerosity because the filing of the involuntary petitions was an event of default that triggered their liability on those guarantees.  They cite no authority that supports this argument.[44]  In fact, their argument actually supports the opposite conclusion because it recognizes the logic that a default cannot precede the filing because it is *conditioned on* the filing.[45]

---

[44] The case they cite, *In re Leibinger-Roberts, Inc.*, 105 B.R. 208 (Bankr. E.D.N.Y. 1989) supports only the proposition that a guaranty is not an executory contract.

[45] Alleged Debtors argue that their liability under these guarantees was triggered under the *ipso facto* clauses "at the same time the Petition was filed."  But, they also assert that "[t]o the extent a default did not already exist, [SEPH's] filing of the involuntary petition caused an immediate default—triggering Alleged Debtors' obligation to pay—under the guarantees."  The latter assertion recognizes that if the filing of the petition "triggered" the default, then the petition necessarily had to come first.

In order to determine which creditors qualify, a court must determine the status of that creditor's claim at the time of filing the petition. Section 303(b) makes no distinction between creditors whose claims are based on guarantees containing *ipso facto* clauses and those whose claims are not. It is illogical to read Section 303(b) the way the Alleged Debtors urge: that is, to examine the status of a creditor's claim *after* the filing of the petition and determine, based on that status, that the creditor should count for numerosity even though its claim would not have counted *before* the petition was filed. Such a reading ignores the very language and essence of the statute.

### Contingent Guaranty Claims that Do Not Count for Numerosity

#### 1. Wells Fargo

Bos and LHI listed Wells Fargo as a creditor holding a $31,945.65 claim based on guarantees. The Wells Fargo guarantees provide, in pertinent part: "If a Default occurs, the Guaranteed Obligations shall be due immediately and payable without notice . . . ." Mr. Knowles testified that he is not aware of any demand on LHI to pay this obligation and that the borrower was current on payments. Bos testified that he has no knowledge of any demand on him by Wells Fargo. As to both Bos and LHI, Wells Fargo will not count for numerosity because its claim was contingent at the time of the petitions.

## 2. <u>American Bank of Texas</u>

Bos listed American Bank of Texas as a creditor holding a claim for $12,316,635.00 based on a personal guaranty.[46]  Alleged Debtors maintain that because this guaranty provides that Bos is "liable for the Guaranteed Debt as a primary obligor," Bos's contingent guaranty liability was transformed into, in essence, liability on a note.  Neither the guaranty itself nor the evidence support this.  Other language in this guaranty conflicts with such a reading.   The guaranty consistently refers to Bos as "Guarantor" and LYC Destin, LLC as the "Borrower;" it states that the "Borrower" has signed a note and is indebted on a loan; it provides that "Lender is not willing to make the Loan . . . to Borrower unless Guarantor [Bos] unconditionally guaranty [*sic.*] payment. . . ;" it defines the "Guaranteed Debt" as being all sums due from the "Borrower"; and in paragraph 1.5 states that if any of the Guaranteed Debt is not paid, then *upon demand by Lender*, Bos as guarantor shall pay.[47]  The evidence shows that the Borrower was current at the time of the petition, no default had occurred and this lender had made no demand on Bos under this guaranty.  American Bank of Texas's guaranty claim against Bos was contingent

---

[46] Bos listed this obligation as contingent on his personal financial statement delivered to Pacific Western Bank within just a few months before SEPH filed the involuntary petitions.

[47] Bos has also made the argument that his liability under the guaranty was no longer contingent after the petition was filed.  As discussed, *supra*, the Court key is the nature of the liability at the time of the filing of the petition, not immediately after the petition.

as of the date the involuntary petitions were filed.  American Bank of Texas does

not count for numerosity.

### 3.  First Florida Bank

Bos listed First Florida Bank as a creditor with a claim for $709,366.03; he

described this claim as:

> Peter H. Bos, Jr.'s four guaranties, guaranteeing four underlying loans of Destin Custom Home Builders, Inc. and Destin Parcel 160 LLC, making Peter H. Bos, Jr. immediately liable, without notice or demand, for the accelerated loan amounts upon the commencement of bankruptcy proceedings against him.

Bos concedes that the guaranteed loans were current, and no default had occurred,

prior to the filing of the petitions.  Bos testified that he has not received any demand

for payment.  In spite of these unrefuted facts, Bos argues that First Florida Bank's

guaranty claim was noncontingent upon the date of the involuntary petition because

he waived notice of default and demand, and 2) the guarantees state that liability will

be triggered by the filing of a bankruptcy petition.  This argument simply doesn't

hold water.  First Florida Bank shall not count for numerosity because its claim was

contingent at the time of the petition.

### 4.  Pacific Western Bank

Bos  and  LHI  listed  Pacific  Western  Bank  as  holding  a  claim  of

$50,505,476.40 based on guarantees.  As they do with the American Bank of Texas

guaranty, Alleged Debtors focus on language that denominates the guarantors as

"primary obligors" and argue that this language transforms their "guaranty" liabilities into, in essence, those of co-makers. Alleged Debtors ignore other language in these guarantees that specifies that liability is triggered on demand.[48] There was no demand. In fact, no default had occurred at the time of the petition, and Bos testified that the Pacific Western Bank loan remains current. Pacific Western Bank holds a contingent guaranty claim and shall not count for numerosity.

## 5. Beach Community Bank

Bos listed Beach Community Bank as holding a claim for $932,914.97 based on two guarantees. Both guarantees provide: "[i]f the borrower doesn't pay these debts, you will have to. . . . [and] [y]ou may have to pay up to the full amount of the debts if the borrower does not pay." The borrowers were current on their obligations to Beach Community Bank and no default had occurred prior to the filing of the petitions. Bos testified that he has not been called upon to pay under these guarantees. Bos argues that the guaranty claim of Beach Community Bank should count for numerosity because the guarantees contain *ipso facto* clauses. But, the Beach Community Bank guarantees contain no such language. The only *ipso facto*

---

[48] "If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, each Guarantor shall, within five (5) days *after demand* . . . pay . . . the amount due on the Guaranteed Obligations to Agent . . . ." Like the American Bank of Texas guaranty, this guaranty is called a "Payment Guaranty." It states that the lender "is not willing to make the Loan . . . to Borrower unless each Guarantor unconditionally guarantees payment and performance . . . ," making it clear that Pacific Western Bank makes a distinction between the primary obligor on the loan and the guarantors, despite the language on which the Alleged Debtors rely.

language is contained in the two Commercial Loan Agreements to which the guarantees relate, neither of which was signed by Bos.  Both of those documents provide that the "Borrower" will be in default if it "petitions for protection under any bankruptcy, insolvency or debtor relief laws, or is the subject of such a petition or action *and fails to have the petition or action dismissed within a reasonable period of time* . . . ." Under this language, the Borrower is not in default because no petition was filed by or against it.  Beach Community Bank will not count for numerosity under Section 303 because its claim was contingent as of the petition date.

### 6. Ameritas Life Insurance Corp.

Bos listed Ameritas Life Insurance Corp. as a creditor with a guaranty claim of $1,945,061.05, which he described on his second amended list of creditors as:

> Peter H. Bos, Jr.'s Guarantee Agreement, relating to the Promissory Note made by Airport Road Storage, Ltd., making him liable, as if he had contracted for payment of the Note rather than Airport Road Storage, Ltd.

Bos cites no language in this guaranty that supports his description of this claim. Rather, this guaranty limits Bos's liability to obligations such as misapplication of rents or profits, damages as a result of fraud or misrepresentation by the obligor, liability under any environmental indemnity agreement, misapplication of a security deposit and advances for insurance and real property taxes.  SEPH's filing of these involuntary petitions did not trigger a default under the *ipso facto* clause in the Ameritas documents.  Paragraph (c) of the default section states that a default

includes: "[t]he *adjudication* of Maker or any guarantor as a bankrupt or insolvent . . . and the entry of an *order* approving a petition seeking reorganization."[49]  Neither of these events has occurred.

The Ameritas obligation was current and no default had occurred at the time SEPH filed the petitions.  Ameritas had made no demand on Bos under this guaranty.  Under these facts, Ameritas Life Insurance Corp. does not count for numerosity.

### 7.  Community Bank North Mississippi

Bos and LHI listed Community Bank North Mississippi ("Community Bank") as a creditor holding a claim for $7,809,321.00 based on several guarantees.  Each guaranty states, in pertinent part, that "Guarantor will make any payments to Lender or its order, on demand . . . ."  Bos testified that there was no default on the underlying notes and that he has not been called upon to pay on his guarantees.  Mr. Knowles testified that the borrowers were current on the underlying obligation to Community Bank.  While there was evidence that the Community Bank loans matured before SEPH filed the involuntary petitions, the guarantees explicitly require a demand, and there has been no demand.[50]  Because its claim was contingent as of the filing of these petitions, Community Bank will not count for numerosity.

---

[49] (Emphasis added).  This paragraph further provides, in pertinent part:  "[T]he filing by Maker or any guarantor of a petition . . . ; or the admission in writing by Maker or any guarantor of its inability to pay its debts as they become due . . . ."

[50] The only notice given to Alleged Debtors on behalf of Community Bank was dated September 9, 2015, five days after the petitions were filed.  Each of the Community Bank loans was renewed post-petition.

### 8. First Capital Bank

Bos and LHI listed First Capital Bank as a creditor holding a claim for $107,541.86 based on guarantees of a loan secured by an airplane hangar. They claim that these guarantees made them liable as though they were the primary obligors. But, the evidence shows that in July of 2015 the borrower and First Capital Bank agreed that a short sale of the hangar plus a payment of $50,000 would constitute full satisfaction of the underlying loan. Assuming any guaranty liability survived these transactions, which appears not to be the case, it was, at best, contingent at the time the petitions were filed. So, First Capital Bank will not count for numerosity because its claim was either paid in full or contingent at the time of the petitions.

### Insiders

Section 101(31) defines "insider" to include:

(A) If the debtor is an individual—
    (i) relative of the debtor or of a general partner of the debtor;
    (ii) partnership in which the debtor is a general partner;
    (iii) general partner of the debtor; or
    (iv) corporation of which the debtor is a director, officer, or person in control;
(B) if the debtor is a corporation—
    (i) director of the debtor;
    (ii) officer of the debtor
    (iii) person in control of the debtor;
    (iv) partnership in which the debtor is a general partner;
    (v) general partner of the debtor; or

> (vi) relative of a general partner, director, officer, or
> person in control of the debtor;
> . . .
> (E) affiliate, or insider of an affiliate as if such affiliate were the
> debtor . . . .[51]

The definition of "insider" in Section 101(31) "is intended to be illustrative rather than exhaustive."[52]

The Eleventh Circuit in *In re Florida Fund of Coral Gables, Ltd.* applied a two-factor test for insider status first articulated by the Fifth Circuit: "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[53] In determining whether a party constitutes an insider the Eleventh Circuit has also looked to Collier on Bankruptcy ("Collier"): "An insider generally is an entity whose close relationship with the debtor subjects any transaction made between the debtor and such entity to heavy scrutiny."[54]

In *In re Lee* the bankruptcy court used the same two factors in determining that certain creditors were not insiders.[55] There, a single creditor filed an involuntary Chapter 7 against an individual (Mr. Lee). In opposing the involuntary, Mr. Lee

---

[51] "Affiliate" is defined in § 101(2).
[52] *In re Florida Fund of Coral Gables, Ltd.*, 144 F. App'x 72, 75 (11th Cir. 2005) (quoting *In re Holloway*, 955 F.2d 1008 (5th Cir. 1992)) (dealing with insiders as transferees under § 547).
[53] *Id.* (quoting *In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992)).
[54] *Id.* (citing 2 Lawrence P. King, et. al. Collier on Bankruptcy ¶ 101.31, at 101-99 (Revised 15th ed. 1996)). Although *In re Florida Fund of Coral Gables* originated as an involuntary bankruptcy, the Eleventh Circuit analyzed the term "insider" in the context of avoidable preferences; it did not specifically address what a non-statutory insider is in the context of § 303(b)(2).
[55] *In re Lee*, 247 B.R. 311, 313 (Bankr. M.D. Fla. 2000).

listed several creditors who were stockholders in, and apparently directors of, a company he owned.  The court held that this alone would not make them "insiders" because they did not have close relationships with the alleged debtor.[56]

Ruling that a debtor's girlfriend was an insider for the purpose of avoiding an alleged preference, in *In re McIver* this Court focused on the legislative history of the Code[57] and adopted a standard that the Ninth Circuit B.A.P. has used: "insider status may be based on a professional or business relationship with the debtor . . . where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties."[58]

By excluding parties with close relationships to alleged debtors as insiders, Congress recognized that certain categories of creditors are unlikely to join in an involuntary petition against the debtor.[59]

---

[56] *Id.*

[57] *In re McIver*, 177 B.R. 366, 368 (Bankr. N.D. Fla. 1995) ("An insider is one who has a sufficiently close relationship with a debtor that his conduct is made subject to closer scrutiny other than those dealing at arms-length with the debtor." (citing *Loftis v. Minar (In re Montanino)*, 15 B.R. 307 (Bankr. D.N.J. 1981) (citing S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5785, 5810))).

[58] *Friedman v. Sheila Plotsky Bros., Inc.* (*In re Friedman*), 126 BR. 63, 70 (9th Cir. B.A.P. 1991), *overruled on other grounds*, *Zachary v. Cal. Bank & Trust*, 811 F.3d 1191 (9th Cir. 2016).  *See also* 2 Collier on Bankruptcy ¶ 101.31, at p. 101-140 (16th ed. 2015).

[59] *In re DemirCo Group*, 343 B.R. 898, 902 (Bankr. C.D. Ill. 2006) ("these are creditors whose financial or other relationship with the debtor would make them unlikely to join in an involuntary petition against the debtor.") (citing 1 Robert E. Ginsberg & Robert D. Martin, Ginsberg & Martin on Bankruptcy § 2.03[C] (4th ed. 1996, Supp. 2006)).

SEPH argues that four creditors are "non-statutory" insiders that should not count as qualified creditors within the meaning of 11 U.S.C. § 303(b)(2). Two of the four, Kirschner & Legler, P.A. and SSI Destin LYC 1, LLC (SSI Destin), are listed by both Bos and LHI. Phillip Vlahos Builders, LLC (PVB) is only listed as a creditor of Bos; Wharfside-Legendary, LLC (Wharfside) is only listed as a creditor of LHI.

Kirschner & Legler, P.A.

Kirschner & Legler, P.A. ("K&L") is a law firm. Bos and LHI claim K&L as a creditor based on an invoice for legal services. SEPH presented proof of the closeness of the relationship between K&L, Bos and LHI sufficient upon which to rule that K&L is a non-statutory insider.

Attorney Mitch Legler, a K&L shareholder, has been a friend and advisor to Bos and corporate counsel for many of Bos's companies for approximately 35 years. Mr. Legler is Bos's personal attorney as well as LHI's corporate counsel. Both Kirschner and Legler (the "K" and "L" in K&L) own an indirect interest in the Bos and LHI affiliates through their part ownership of Wharfside-Legendary, LLC ("Wharfside").[60] LHI owes about $11 million to Wharfside. Wharfside and LHI are owners of Legendary Group, Ltd. Legendary Group, Ltd. owns 100% of Legendary,

---

[60] Kirschner owns 10% of Wharfside Legendary and Legler owns 90%.

LLC.  Legendary, LLC, another of the Bos & LHI entities, paid K&L's claim post-petition.

The policy behind excluding certain types of creditors supports a ruling that K&L is an insider.  It is patently obvious that even had its claim not been paid post-petition, K&L would never join SEPH as a petitioning creditor because of its close and long-term relationship with both Alleged Debtors.[61]

SSI Destin

SSI Destin is also a non-statutory insider because of its close relationship with Alleged Debtors.[62]

SSI Destin holds a judgment in the amount of $13,832,767.12 against Bos and LHI.[63]  Alleged Debtors stipulated to entry of this judgment.  SSI Destin is owned by Goldstead Properties, Ltd., which in turn is owned and controlled by Tim Horgan, who resides in the UK.  Tim Horgan has been a personal friend and business associate of Bos for twenty years.  SSI Destin did not loan money to Alleged Debtors.  Rather, it purchased its claim from BB&T in August 2011 after BB&T had sued Bos and LHI.  No evidence was presented to show or explain what caused SSI

---

[61] Even if the Court did not find K&L to be an insider of the Alleged Debtors, it would still be excluded from the numerosity count because it received a post-petition payment from Legendary, LLC—an affiliate of Alleged Debtors.

[62] SEPH argues, and it appears likely, that SSI Destin could be deemed a statutory insider under the Bankruptcy Code and Florida Law.  11 U.S.C. § 101(31); § 726.102, Fla. Stat. (2016).  Because the Court finds that SSI Destin is a non-statutory insider, it is unnecessary to analyze here its possible statutory insider status.

[63] This judgment is also against a related entity, Emerald LTA-1, Inc.

Destin to purchase BB&T's claim.   After Bos and LHI stipulated to the final judgment in favor of SSI Destin in November 2011,[64] nothing happened with this judgment during the next three years, during which SSI Destin made no attempt to collect this judgment from Bos or LHI.[65]

The only activity on SSI Destin's claim came months after SEPH obtained its judgment against Alleged Debtors in November 2014, when Alleged Debtors stipulated to charging orders in favor of SSI Destin.[66]   The charging orders gave SSI Destin a first priority lien on Bos's shares in LHI and LHI's interests in companies, including Legendary Group, Ltd, comprising the only valuable assets it owns.

Where there is a close relationship between the alleged debtors and a creditor, the facts require "closer scrutiny."[67]   It appears clear that the timing of these "friendly" charging orders was not a coincidence.   These charging orders caused SSI Destin, through Tim Horgan, a close personal friend of Bos, to displace SEPH as Bos and LHI's most powerful and secured creditor.

Tim Horgan, the ultimate owner and manager of SSI Destin, is closely

---

[64] Bos signed the consent to final judgment in his individual capacity, and as president of both LHI and Emerald LTA-1, LLC.

[65] The information on Alleged Debtors' creditor lists reported this claim as "being paid" in accordance with terms of a Forbearance Note, but this was refuted by the evidence at trial.  Bos has never made a payment to SSI Destin; LHI has made payments in the past but the last one was made in October of 2014.

[66] The first charging order was entered on June 9, 2015.  The second charging order was entered on July 1, 2015.

[67] S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5810; 2 Collier on Bankruptcy ¶ 101.31 at 101-140 (16th ed. 2015).

connected to Bos in other ways. Bos owns an entity by the name of PBTB, LLC.[68]

Horgan and PBTB, LLC own THPB, LLC, of which Bos is the managing member.[69]

Bos is an authorized representative of Horgan's company, THAH, LLC. As of

March 25, 2015, Tim Horgan co-owned an entity named EG1306, LLC with Destin

Coastal, LLC, which is owned by Teresa Bos, Bos's wife.

Bos and LHI helped continue SSI Destin's corporate existence, even though

SSI Destin is one of their largest creditors. Wendy Parker is Bos's personal secretary

and LHI's corporate secretary. Ms. Parker signed the 2015 Annual Report of SSI

Destin as "Secretary" and certified under oath that she was a "managing member or

manager" of that entity, even though she testified at trial that she has never been

either.[70] Ms. Parker filed and signed SSI Destin's 2015 Annual Report as a courtesy

to SSI Destin (and presumably Tim Horgan) at the request of LHI's Vice President,

Pete Knowles. Bos testified that SSI Destin has an interest in the long-term success

of LHI and does not want to burden the company by demanding short-term

payments.[71]

---

[68] "PB" stands for Peter Bos and "TB" stands for Theresa Bos, his wife.
[69] Presumably, THPB stands for Tim Horgan and Peter Bos. SEPH correctly points out that THPB is an insider of Tim Horgan; it is also an insider of Bos because of his status as its manager and because of Tim Horgan's affiliation as one of its owners. An insider of an insider of the debtor is an insider of the debtor. *In re Parks*, 503 B.R. 820, 835 (Bankr. W.D. Wash. 2013) (holding that one-year preference period was applicable because individual was an insider of an insider as to the debtor). Horgan is an insider of Bos.
[70] That certification, which is part of the official form promulgated by the Florida Department of State, further provides that Ms. Parker is "or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes."
[71] *See In re Smith*, 415 B.R. 222, 233 (Bankr. N.D. Tex. 2009).

Bos and LHI argue that the debt owed to SSI Destin is the result of an arms'

length transaction because it is documented by hundreds of pages of loan

documentation. While the SSI Destin claim may have originated as an arms' length

transaction with BB&T, it did not remain arms' length after Mr. Horgan caused SSI

Destin to purchase the claim. In applying the test articulated in Collier,[72] SSI Destin

is without question an entity whose close relationship with Alleged Debtors subjects

any transactions made between them to heavy scrutiny. Under the totality of the

circumstances, SSI Destin is an insider, and so does not count toward numerosity for

purposes of Section 303 for either Bos or LHI.

## Wharfside-Legendary, LLC

LHI listed Wharfside-Legendary, LLC ("Wharfside") as a creditor with a

claim in the amount of $11,460,483.75. Alleged Debtors argue that Wharfside's

claim is an arms' length transaction. As with SSI Destin, they point to "hundreds of

pages" of loan documents that support Wharfside's claim. But, as with SSI Destin,

the fact that Wharfside's claim may have originated as arms' length does not prove

that it stayed that way. In fact, the evidence proves the opposite. The Wharfside

claim originated in 2005 as part of a $26 million loan made to Bos entities by iSTAR

Financial, Inc. guaranteed by LHI and Bos.[73] Wharfside took an assignment of the

---

[72] 2 Collier on Bankruptcy ¶ 101.31, at p. 101-40 (16th ed. 2015).

[73] It is unclear why Bos did not list Wharfside as a creditor. The most recent agreement pertaining to the Wharfside claim, executed by Bos, LHI and Wharfside effective on June 30, 2013, lists Bos as a Guarantor

claim on May 1, 2009.  SEPH filed its law suit against Bos and LHI in 2009.  Mitch Legler, shareholder in K&L and Bos's lawyer for 35 years, owns 90% of Wharfside. Legler's law partner, Kirschner, owns the other 10% of Wharfside.  The other two co-owners of Legendary Group, Ltd. are LHI and Coastal Holdings, LLC, a company owned by Mr. and Mrs. Bos.

An agreement between Alleged Debtors and Wharfside in June 30, 2013, states that neither Bos nor LHI had made any payments to Wharfside since 2009. Because Legler and Kirschner own Wharfside, and due to their close relationship with Bos and LHI, it is patently obvious that Wharfside has no interest in joining these involuntary petitions or taking other action adverse to Alleged Debtors.  Mr. Legler testified that although neither Bos nor LHI are making payments on the Wharfside loan, there is a plan for them to do so when they become healthy enough.

In applying the tests set forth in Collier and *In re McIver*, the evidence is more than sufficient to show that Wharfside is a non-statutory insider of LHI.  To rule that Wharfside is anything other than a non-statutory insider would be contrary to the purpose of the exclusion language of § 303(b)(2).

<u>Phillip Vlahos Builders, LLC</u>

Bos lists Phillip Vlahos Builders, LLC (PVB) as a creditor with a claim in

---

and recites that he and LHI "at all times have had personal liability on" the note "with a current outstanding principal balance as of this date, including accrued and unpaid interest, of $16,779,294.19 . . . ."

the amount of $2,285 represented by an invoice for renovations to and work on a prefabricated garage at Bos's home.  PVB is a non-statutory insider because of Phillip Vlahos' business and family ties.  Phillip Vlahos is the son-in-law of Pete Knowles,[74] owns and is the managing member of PVB, and is president of Destin Custom Home Builders, LLC (DCHB).  Bos is the CEO of DCHB.

Alleged Debtors assert that the documentation of PVB's claim by a contract and an invoice proves its claim to be an arms-length transaction.  But, one of the purposes of Section 303(b)(2) is to prevent counting creditors who have no reason or incentive to join an involuntary petition.  PVB is such a creditor and so will not count for numerosity.

"Small" and "Small and Recurring" Creditors

Counsel for the parties worked hard and did an excellent job presenting the details of and facts behind each creditor listed by Bos and LHI, including those that fall into the "small" or "small and recurring" categories.  For that reason, and although a ruling on this issue is unnecessary, the Court will address the current law as it relates to these types of creditors in relation to involuntary bankruptcy.

By statute, certain "holders" of claims are expressly excluded as qualifying creditors: employees, insiders, and recipients of voidable transfers.[75]  In this Circuit,

---

[74] Pete Knowles is the Vice President of LHI and general business manager of all of the Legendary group; he works directly under and reports directly to Bos.

[75] 11 U.S.C. § 303(b)(2).

beginning with a case decided by the Fifth Circuit Court of Appeals in 1971, *Denham v. Shellman Grain Elevator, Inc.*, creditors with small claims due and paid monthly have also been excluded.[76] In *Denham*, the petitioning creditor obtained a judgment against the alleged debtor.  Just before the judgment was entered, the alleged debtor recorded a warranty deed that transferred all of his assets, with the exception of three automobiles, to another. Until the involuntary petition was filed, the alleged debtor routinely paid his business and personal bills on the tenth of each month following the month for which the bill was incurred.  As of the date of the involuntary petition the alleged debtor had eighteen creditors holding claims aggregating only $467.13.[77] Seventeen of these creditors held very small claims based on consumer debts the alleged debtor normally paid monthly; the judgment creditor held the only substantial, non-recurring claim.  After the judgment creditor filed the involuntary petition the debtor stopped paying his bills every 30 days.  Construing § 59(b) of the Bankruptcy Act, the precursor to the present-day Section 303,[78] the Fifth Circuit held that the alleged debtor in *Denham* had engaged in an artifice or scheme to avoid the letter and spirit of the law:  he had conveyed all of his property to prefer another creditor and then attempted to avoid an involuntary petition by purchasing small

---

[76] 444 F.2d 1376 (5th Cir. 1971). *Denham* is controlling in the Eleventh Circuit because it was decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

[77] Seven debts were less than $10; six debts were less than $25; and only one claim exceeded $100.

[78] When *Denham* was decided, § 56(c) of the Bankruptcy Act stated that claims of under $50 should not be counted in computing the number of creditors voting or present at creditors' meetings, although those claims counted towards computing the amount of claims.

items and having them charged on monthly accounts.  Based on these facts, the court in *Denham* held that Congress did not intend to allow recurring bills, such as utility bills, to defeat the use of an involuntary petition, even in the absence of such an artifice or scheme.[79]

Contrary to *Denham* and its progeny, courts in the Seventh, Eighth, and Ninth Circuits, include creditors holding small and recurring or *de minimis* claims as qualifying creditors under § 303(b) on the basis that nothing in the Bankruptcy Code specifically authorizes such creditors to be excluded.[80]  Because *Denham* is still binding precedent in the Eleventh Circuit, the Court is required to exclude creditors with small *and* recurring claims from the numerosity requirement of Section 303.[81]

In cases within the Eleventh Circuit, including those decided before the current Section 303 was enacted, courts agree that *Denham* requires claims that are both small and recurring to be excluded from numerosity.[82]  In *In re Atwood*, in

---

[79] *Denham*, 444 F.2d at 1379.

[80] *In re Rassi*, 701 F.2d 627 (7th Cir. 1983) (including creditors with small, recurring claims for the purpose of determining the number of required petitioning creditors and refusing to engraft the *Denham* rule into § 303); *In re Okamota*, 491 F.2d 496 (9th Cir. 1974) (declaring that *Denham* "ignored unambiguous" direction from Congress); *Theis v. Luther*, 151 F.2d 397 (8th Cir. 1945).

[81] *Denham*, 444 F.2d at 1379.  The Court voiced concern that an alleged debtor could concoct a scheme to make it impossible for creditors to file an involuntary petition.  Such a scheme would involve purchasing small items on *monthly* account so that a debtor would always have more than twelve creditors. The creditors with these accounts would feel secure in having their bills paid promptly and would not risk losing a good customer by joining an involuntary petition. The Fifth Circuit emphasized the concern that *recurring* bills such as utility bills would allow a debtor to escape an otherwise meritorious involuntary petition.

[82] *Sipple v. Atwood (In re Atwood)*, 124 B.R. 402 (S.D. Ga. 1991); *In re Smith*, 243 B.R. 169 (Bankr. N.D. Ga. 1999); *In re Crain*, 194 B.R. 663 (Bankr. S.D. Ala. 1996); *In re Atwood*, No. 88-41165, 1992 WL 12004559 (Bankr. S.D. Ga. May 14, 1992); *In re Atwood*, No. 88-41165, 1992 WL 12679066 (Bankr. S.D. Ga. Feb. 7, 1992) (one of three separate opinions cited here); *In re Smith*, 123 B.R. 423 (Bankr. M.D. Fla. 1990).

discussing *Denham* the district court emphasized that an exception for small, recurring claims was not drafted by Congress.[83]    But the *Atwood* court still felt bound to follow *Denham* so it remanded the case to the bankruptcy court to determine if certain debts were both small and recurring.[84] In *In re Smith*, citing to *Denham*, the bankruptcy court for the Middle District of Florida excluded "insignificant debts which are customarily paid on a regular basis."[85]   In a second case named *In re Smith*, the bankruptcy court for the Northern District of Georgia followed *Denham* and held that recurring claims for pest control services, cable and telephone services did not count for numerosity.[86]   Citing *Denham* in dicta, the bankruptcy court in *In re Crain* stated that small, recurring debts were not to be

---

[83] 124 B.R. 402, 406 (Bankr. S.D. Ga. 1991).

[84] *Id.*  On remand, the bankruptcy court in *Atwood* determined that the following debts were non-recurring and should count toward numerosity:

    (1)    a $264.83 debt to the gas company was for the purchase of a gas tank and not ongoing utility service;

    (2)    $1.11 owed to a bank, though small, was to cover an overdraft and was not recurring;

    (3)    an $18 debt to an animal hospital was for one-time treatment of an injured dog and not a recurring claim;[84]

    (4)    a $17.25 debt to a library was for an isolated purchase of a book;

    (5)    $35.02 owed to a hospital was for a one-time medical test;

    (6)    a debt of $375 for engine repair; and

    (7)    $529 due for consulting work.

*In re Atwood*, 1992 WL 12004559, at *2.  It found other debts to be small and recurring, and therefore excluded from those qualified to file an involuntary petition:  utility bills, the cable bill, a monthly bill for pest control services, and recurring newspaper and magazine bills.  *In re Atwood*, 1992 WL 12679066, at *7.

[85] 123 B.R. 423, 425 (Bankr. M.D. Fla. 1990).

[86] 243 B.R. 169, 187 (Bankr. N.D. Ga. 1999).

counted in determining if there are twelve creditors for purposes of an involuntary petition.[87]

In a much more recent case in the Eleventh Circuit, *Isbell v. DM Records, Inc.*, a Florida district court discussed the arguments in favor of not applying *Denham* but nevertheless followed *Denham* as circuit precedent.[88]   That court counted claims of nine music publishers, finding them contingent, irregular, and non-recurring.[89]  In *In re Stewart*, a case oft-cited by SEPH for a variety of reasons, the *Denham* rule was at issue; but because the court had already disqualified the small and recurring debts on the basis that the debtors had paid them post-petition, it never reached whether those debts should be disqualified purely on the basis of being *de minimis* or small and recurring.[90]

Alleged Debtors urge this Court not to follow *Denham,* citing *In re Beacon Reef Ltd. P'ship.*, which they say, "disagree[d] with *Denham.*"[91]  But the court in *Beacon Reef* did not cite to or expressly disavow *Denham*.  Rather, that court was

---

[87] 194 B.R. 663, 667 n.4 (Bankr. S.D. Ala. 1996) (The court had already disqualified the debtors' small and recurring creditors that had received post-petition payments, so the small and recurring debts exception was not an issue.).

[88] 529 B.R. 793, 798 (S.D. Fla. 2015).

[89] *Id.* at 799.  Each publisher had a claim for royalties due when (and if) the alleged debtor sold or licensed a song.  One publisher had not received any royalty payments in 2009.

[90] *In re Stewart*, No. 14-03177, 2015 WL 1282971, at *7 (Bankr. S.D. Ala. Mar. 18, 2015).  The *Stewart* court mentioned in passing *Denham* as standing for not counting *de minimis* debts and the Florida opinion in *In re Smith* as authority for not counting "small recurring debts."

[91] *In re Beacon Reef Ltd. P'ship*, 43 B.R. 644 (Bankr. S.D. Fla. 1984).

not persuaded to disregard a small claim as *de minimis*, and was not willing to hold

that claims of accountants and attorneys should not count for numerosity.[92]

Alleged Debtors also urge this Court to question the viability of *Denham*

because it was decided on two provisions of the old Bankruptcy Act; one (§ 56(c))

has no counterpart in today's Code and the other (§ 59) was superseded by the

Code.[93]  They also argue what courts in other circuits have held:  that there is no

exclusion for any "small and recurring" creditors in the Code, so one should not be

imposed by judicial fiat.  These arguments are not without merit.  But, *Denham*

remains binding precedent in this Circuit.  Further, no *Denham* ruling is necessary

in this case because none of the creditors that SEPH argues should be excluded hold

"small and recurring" claims so they all count for numerosity under Section 303.[94]

<u>Taxing Authorities</u>

In order to count for numerosity as to an involuntary petition a creditor must

be a holder of a claim against a person.[95]  On his second amended list of creditors,

Bos listed a $17,991.87 claim of the Okaloosa County Tax Collector ("Tax

Collector") for real property taxes assessed on his homestead.  As a result of granting

---

[92] *Id.* at 646.

[93] *In re Elsa Designs, Ltd.*, 155 B.R. 859, 865 (Bankr. S.D.N.Y. 1993) ("Section 56c, however, has no counterpart under the Code and Rule 2007 of the Federal Rules of Bankruptcy Procedure has deleted the provision in its forerunner, Bankruptcy Rule 207, which prohibited a holder of a claim less than $100 from voting at a creditors' meeting."); *In re Reid*, 107 B.R. 79, 82 (Bankr. E.D. Va. 1989).

[94] Attached as an Appendix to this opinion is a chart showing the creditors SEPH sought to exclude as "small" or "small and recurring" and the reasons each will not be excluded.

[95] 11 U.S.C. § 303(b).

Alleged Debtors' Rule 15(b) motion to amend their pleadings, *supra,* a total of six taxing authorities, including the Tax Collector, listed on the property tax notice are now under consideration as separate creditors, as though listed separately on Bos's creditor list.[96]   All of these authorites hold claims for ad valorem taxes or assessments.

In Florida, there is no personal liability for ad valorem taxes or the other assessments listed on the property tax notice.[97]   The Tax Collector and each other entity listed on the property tax notice holds an *in rem* claim only.   For that reason, neither the Tax Collector nor the other five authorities on the property tax notice constitute "a holder of a claim against such person [Bos]" as required by § 303(b), so none count for numerosity under Section 303.[98]

Alleged Debtors cite no Florida law in support of counting the Tax Collector and other entities listed on the tax notice as separate creditors for purposes of numerosity.   They cite a Texas case, *In re Smith,* in which the bankruptcy court counted the taxing authorities based on Texas law.[99]   Under Florida law, like in Texas, each taxing authority is a separate legal entity authorized to levy ad valorem

---

[96] Those taxing authorities include: Okaloosa County, School RLE, School CAP IMP/DISC, Destin, Water MGMT (the first portion of this authority is not visible on the exhibit), and Destin FD.
[97] *In re Ratliff's Estate*, 188 So. 128, 133 (Fla. 1939).
[98] 11 U.S.C. § 303(b)(1).
[99] *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

taxes.[100]  So each may have a separate claim.  But, just having a claim is not enough. Although the *Smith* court specified that a claim must represent a right to payment,[101] it did not focus on the fact that for purposes of numerosity a claim must be against a person.[102]  Ultimately, the court in *In re Smith* did not count the taxing authorities' claims for two reasons:  1) the alleged debtor did not list them; and 2) they were contingent when the involuntary petition was filed, stating in part:

> Under Texas law, it is not the property taxes that become due and owing on January 1st of each year. Rather, it is a lien that attaches on January 1st of each year "to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property, whether or not the taxes are imposed in the year the lien attaches." . . . While this gives rise to a claim in bankruptcy because as [sic] a right to payment, the liquidated amount due for tax payments for a particular year generally are not assessed against the taxpayer until approximately October 1 of that year.[103]

Similarly, in Florida it is not the property taxes that become due and owing on January 1st of each year; rather, the real property is assessed on January 1 of each year and a lien attaches to the property on that date.[104]  Florida property taxes are

---

[100] Art. VII, § 9(a) Fla. Const. states: "Counties, school districts, and municipalities shall, and special districts may, be authorized by law to levy ad valorem taxes and may be authorized by general law to levy other taxes, for their respective purposes, except ad valorem taxes on intangible personal property and taxes prohibited by this constitution."

[101] 11 U.S.C. § 101(5).

[102] 11 U.S.C. § 303(b)(1) & (2).

[103] *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (citing *In re Midland Indus. Service Corp.*, 35 F.3d 164, 166 (5th Cir. 1994) (statutory citations omitted)). "Until that time, the liability is contingent." *Id.* at 237-38 (citing *In re Anchor Glass Container Corp.*, 375 B.R. 683, 687 (Bankr. M.D. Fla. 2007) (claim may be contingent because due date for the tax payment had not passed as of the petition date or unliquidated because the taxing authority has not yet set tax rates)).

[104] §§ 192.042, 192.053, & 197.122 Fla. Stat. (2015).

due and payable on November 1 of each year.[105]    SEPH filed the petitions on September 4, 2015.  Like the tax claims in *Smith,* the claims held by the entities on the tax bill, including the Tax Collector, remained contingee as of the petition date.[106]    So, none of the entities listed on the real property tax bill count for numerosity.[107]

<u>Fully Secured Creditors</u>

SEPH argues that two of Bos's creditors should not be counted because their claims are fully secured:  the Tax Collector and Charter Bank.[108]    Both of these creditors are excluded from numerosity for other reasons, so it is unnecessary to address them here.

<u>Creditors that Received Post-Petition Payments</u>

Section 303(b)(2) excludes from numerosity a transferee of a post-petition transfer that is "voidable" under 11 U.S.C. § 549.[109]    Section 549 provides:

[T]he trustee may avoid a transfer of property of the estate—
(1)  that occurs after the commencement of the case; and
(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
(B) that is not authorized under this title or by the court.

---

[105] § 197.333 Fla. Stat. (2015).
[106] *In re Anchor Glass Container Corp.,* 375 B.R. 683, 687 (Bankr. M.D. Fla. 2007) (tax claim "may be contingent, for example, because the due date for the tax payment had not passed as of the petition date" (citing *In re Wang Zi Cashmere Products, Inc*., 202 B.R. 228, 230 (Bankr. D. Md. 1996))).
[107] *In re Smith,* at 237-38.
[108] Charter Bank's claim is *in personam* as well as *in rem,* so an analysis of its status as a fully secured creditor would be different from the analysis of the Tax Collector's claim.
[109] 11 U.S.C. § 303(b)(2).

11 U.S.C. § 549(a).[110]  SEPH argues that certain creditors of Bos and LHI received post-petition payments voidable under Section 549, and so should be excluded for purposes of numerosity under Section 303(b)(2).  In order to reach a ruling, it is necessary to ascertain which, if any, post-petition payments may be voidable.

<u>Creditors that received payments from the TBE account.</u>

Creditors that received post-petition payments from the TBE account will not count for numerosity.[111]

The following creditors received post-petition payments from the tenants by the entirety ("TBE") bank account owned by Bos and his wife:  Charter Bank, First Florida Bank Visa, American Express (Centurion Bank), Lowe's (Synchrony Bank), Destin Cleaners, Archiscapes, Coastline Tree Service, The Perfectionists Complete Lawn & Landscape, LLC, Dr. Jos Bakker, Home Team Pest Defense, and Capital One Bank (USA), N.A.  It is undisputed that these payments were made as permitted under § 303(f).[112]  Alleged Debtors assert that because the TBE account is exempt under Florida law Bos's interest in that account is not property of the estate; and for

---

[110] 11 U.S.C. § 549(b) and (c) exclude from the operation of § 549(a) certain types of transfers not applicable here.

[111] The Court makes no determination that this account is exempt, even though Bos claims it is exempt as being owned by him and his wife as tenants by the entireties.

[112] *See* 11 U.S.C. § 549(a).  Section 303(f) provides that, except pursuant to a contrary order of the court, prior to the entry of an order for relief in the case (or during the "gap period" between the filing of the petition and the entry of an order for relief), "any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced."  11 U.S.C. § 303(f).

that reason, post-petition payments from that account are not voidable under § 549. This argument is unpersuasive.

The filing of a bankruptcy petition, including an involuntary petition, creates an estate.[113] Upon creation of the estate, "all legal or equitable interests of the debtor in property" become property of the estate, including "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, . . . ."[114] "The scope of § 541(a)(1) is broad, and includes property of all types, tangible and intangible, as well as causes of action."[115] So the first question becomes whether Bos had a legal or equitable interest in the TBE account upon the filing of the involuntary petition. The answer to this question is yes. "[A]ll legal or equitable interests" includes "the debtor's interest in property held as a tenancy by the entireties."[116] The next question is whether, if the TBE account is exempt entireties property, means that Bos's interest in that account did not become property of the estate. The answer to this question is no. The fact that an asset may be exempt does not preclude the debtor's interest in that asset from becoming § 541 property of the estate. "'[E]xclusion' and 'exemption' do not mean the same thing. Property that is excluded from the bankruptcy estate never comes into the estate at all, by operation of law, while

---

[113] *See* 11 U.S.C. § 541(a).
[114] 11 U.S.C. § 541(a)(1), (6).
[115] *In re Meehan*, 102 F.3d 1209, 1210 (11th Cir. 1997) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 & n.9 (1983)).
[116] *In re McRae*, 308 B.R. 572, 575 (Bankr. N.D. Fla. 2003).

*exempt property is estate property at all times* but is protected from the reach of creditors and administration through the estate if the debtor exercises the statutory option."[117]  Section 541(b) lists what property is not property of the estate; exempt property is not included on the list.[118]

Alleged Debtors assert that because none of the creditors that received post-petition payments from the TBE account had judgments against or liens on that account, and none held claims against Mr. and Mrs. Bos, then ultimately Bos's claim of exemption as to the TBE account would prevail.  This might be true.[119]  But, it does not support the Alleged Debtors' conclusion that the creditors who received payments from the TBE account count for numerosity.  Exemptions are provided for in Section 522 of the Code, which provides, in pertinent part, that an individual "may exempt from property of the estate" certain property.[120]  Property of the estate is determined on the filing of the petition; exemptions are determined after the order for relief, and only after they are claimed by the debtor.[121]  In an involuntary case,

---

[117] *In re Houck*, 181 B.R. 187, 193 n.16 (Bankr. E.D. Pa. 1995) (citing 11 U.S.C. § 522) (emphasis added).
[118] 11 U.S.C. § 541(b).
[119] The fact that Bos successfully claimed the TBE account as exempt under Florida law when SEPH garnished the account does not establish the account as exempt in bankruptcy; especially against an attack on that exemption by a Chapter 7 bankruptcy trustee.
[120] 11 U.S.C. § 522(b)(1).
[121] While the time for claiming exemptions in a voluntary case begins to run upon the filing of the petition, in an involuntary case, the time period does not begin until an order for relief is entered.  *See* Fed. R. Bankr. P. 4003(a) ("A debtor shall list the property claimed as exempt under § 522 of the Code on the schedule of assets required to be filed by Rule 1007."); Fed. R. Bankr. P. 1007(c) ("In an involuntary case, the schedules, statements, and other documents required by subdivision (b)(1) shall be filed by the debtor within 14 days *after the entry of the order for relief*.") (emphasis added).

the determination of which creditors count is based on the facts as they existed as of the date of the petition. The test under Section 303(b)(2) is whether a creditor is a transferee of a transfer that is "voidable" under Section 549. Because Bos's interest in the TBE account is property of the estate, and because the exempt status of this account has not yet been claimed or determined, transfers from that account are "voidable" under § 549.[122]

Even had Bos not owned an interest in the TBE account, the payments out of that account could be voidable under § 549. In *In re Smith,* post-petition payments to creditors out of the debtor's wife's account were held voidable because the money in that account came from an offshore trust owned by the alleged debtor.[123] Here, the TBE account is the only bank account in which Bos has an interest. At least part of the money in the TBE account came from Bos's social security income. If nothing

---

[122] *In re Stewart*, No. 14-03177, 2015 WL 1282971, at *6 (Bankr. S.D. Ala. Mar. 18, 2015):

> Some courts do not count prepetition creditors whose debts are paid during the gap period—the period between the filing of the involuntary petition and the entry of an order for relief—if the debt is paid with property of the estate since such payments would constitute voidable transfers. *See In re CorrLine International, LLC,* 516 B.R. 106 (Bankr.S.D.Tex.2014); *In re Atwood,* 124 B.R. 402 (S.D.Ga.1991); *In re Roselli,* 2013 WL 828304 (Bankr.W.D.N.C.2013).
>
> . . .
>
> Because these payments would constitute voidable transfers, the Court will not count the prepetition creditors who were paid during the gap period. This result makes sense. The gap period is commonly used by a petitioning creditor to solicit other petitioning creditors. Paying off other creditors during this period defeats any incentive they might have to join the petition. In fact, it gives such creditors something to lose—a voidable transfer—should the bankruptcy proceed.

[123] 415 B.R. at 234.

else, common sense dictates that payments from this account to Bos's creditors could be avoided under § 549.[124]

### Post-petition payments made to creditors from entities that are closely related to Bos and LHI.

Certain Bos creditors received post-petition payments from entities closely related to Bos:  Bloom, Sugarman, Everett, LLP and Lisa Jo Spencer, P.A. received post-petition payments from Legendary Group, Ltd.; Matthews & Jones, LLP received a post-petition payment from Regatta Bay Investors, Ltd.; and Regions Bank received a post-petition payment from Lorna Properties, LLC, a wholly owned subsidiary of Legendary Group, Ltd.[125]  Ten LHI creditors received post-petition payments from closely related entities; seven of those creditors were paid by Legendary Group, Ltd. or Legendary, LLC.[126]  Because there was no credible evidence that the other three were creditors of LHI they will not be addressed in this section.[127]

---

[124] *See, e.g.*, *In re Lawrence,* 251 B.R. 630, 640 (S.D. Fla. 2000), *aff'd*, 279 F.3d 1294 (11th Cir. 2002) (recognizing a court's duty to exercise common sense).

[125] Some creditors received postpetition transfers from an account owned by Mr. Bos's wife, Terri Bos: Charter Bank, American Express Centurion Bank, Lowe's, Destin Cleaners, and The Perfectionists Complete Lawn Care.  Because these same creditors also received postpetition payments from the TBE account and so do not count for numerosity, *supra*, it is unnecessary to discuss them again.  SEPH pointed out that other creditors received post-petition payments from entities closely related to Bos.  In light of this discussion and the entirety of the opinion, it is not necessary to address those other creditors.

[126] LHI's creditors that were paid post-petition by Legendary Group, Ltd.: Bloom, Sugarman, Everett, LLP; Lisa Jo Spencer, P.A.; Beach Community Bank; and Genworth Life & Annuity Insurance.  Creditors that were paid post-petition by Legendary, LLC: CRS Insurance Group, LLC; Allied Insurance; and First Insurance Funding Corp.  The Court notes that other LHI creditors received post-petition payments from entities closely related to it, but it is not necessary to address those creditors.

[127] *See infra*, discussion of creditors listed that had no claims against LHI.

As was held in *In re Stewart*, business interests held as of the date of the petition are property of the estate and any income from those interests are proceeds of property of the estate.[128]   Neither Bos nor LHI reported having any source of business income other than the Legendary group entities.[129]

Alleged Debtors tried to prove that payments made by the Legendary group entities were from "earmarked loans."   An earmarked loan is a loan that a third party makes to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor.[130]   The proceeds of an earmarked loan never become part of the debtor's assets, and therefore no preference is created.[131]   The rule is the same regardless of whether the proceeds of the loan are transferred directly by the lender to the debtor's creditor or are paid to the debtor with the understanding that they will be paid to the creditor in satisfaction of the debtor's claim, so long as the proceeds are clearly "earmarked."[132]

Alleged Debtors' evidence that certain post-petition payments were "earmarked" fell quite short.   Bos testified first.   During his testimony Bos never

---

[128] 2015 WL 1282971 at *7.

[129] LHI is a holding company that has no income of its own.   Bos testified that he also receives Social Security income.   The evidence also shows that the Legendary group entities pay for his vehicles, realtor association dues, business expenses on his credit cards, yacht, and vessel, at minimum.

[130] 2 Collier on Bankruptcy ¶ 547.03[2][a], at p. 547-21 (16th ed. 2015).

[131] *Id.*

[132] *Id.* The earmarking doctrine has been recognized by courts as a defense to a § 547 avoidance action. *See Campbell v. Hanover Ins. Co.* (*In re ESA Envtl. Specialists, Inc.*), 709 F.3d 388, 396 (4th Cir. 2013); *In re Barefoot Cottages Dev. Co., LLC*, No. 09-50089, 2009 WL 2842735 (Bankr. N.D. Fla. 2009).   It also has been applied as a defense to a § 549 avoidance action. *See In re Westchester Tank Fabricators, Ltd.*, 207 B.R. 391, 397 (Bankr. E.D.N.Y. 1997).

once mentioned the existence of "earmarking" or "earmarked loans." Pete Knowles testified after Bos. He testified that the payments made by the Legendary group entities to LHI's creditors were the result of earmarked loans, but admitted there is nothing in writing that supports this testimony.[133] Mr. Knowles' use of the term "earmark" and "earmarked' during the second part of the trial seemed forced or contrived; especially in light of the fact that neither he nor Bos had made any prior mention of these terms during their testimony. The Court finds the testimony that these payments were from "earmarked" loans not credible.[134]

As SEPH points out, the earmarking defense is not available if the debtor controls the application of the "loan."[135] Here, even if one believes that these payments constituted "earmarked loans" from the beginning, it is clear that Alleged Debtors were in control of, either directly or indirectly, post-petition payments made by Legendary Group, Ltd. and Legendary, LLC. Bos is the president of LHI. LHI is the general partner of Legendary Group, Ltd., which in turn is the manager of Legendary, LLC. LHI's closeness to Legendary Group, Ltd. and Legendary, LLC is undeniable. Mr. Knowles testified that he takes direction from Bos. Wendy

---

[133] Although Mr. Knowles testified to the existence of some book entries of "earmarked" loans, no documents in evidence reflect these entries, and there is no evidence that such entries were made pre-petition other than this testimony.

[134] The reason the terms "earmarked" or "earmark loans" were repeated numerous times during Mr. Knowles' testimony became evident during closing argument when, for the first time, Alleged Debtors' counsel argued case law that used the term "earmarked."

[135] 2 Collier on Bankruptcy ¶ 547.03[2][a], at p. 547-22, 23 (16th ed. 2015).

Parker testified that she takes direction from Mr. Knowles.  While Mr. Knowles'

testimony that each entity within the Legendary group pays bills as directed by its

own manager may be true in some respects, it does not negate the obvious control

over all entities that is held by Bos.  For this reason, the exception to the earmarking

doctrine would apply; these post-petition payments would be voidable under §

549.[136]

### Creditors that Did Not Hold a Claim on the Date of the Petition

SEPH argues that four of Bos's creditors and three of LHI's creditors did not

hold claims on the date of the petition and should be excluded from numerosity.[137]

### TNT Metal Buildings, Inc.

Bos lists TNT Metal Buildings, Inc. ("TNT") as a creditor holding a claim for

what he described as the remaining balance due under a contract for the installation

of a garage door.  The entity on the documents "evidencing" this claim is named T-

N-T Carports, Inc., not TNT Metal Buildings, Inc.  Regardless, the "Terms and

Conditions" of the contract states that Bos "agrees to pay the Price . . . in full at the

time of installation."  It also provides that the seller reserves the right to cancel the

---

[136] Policy concerns also support this ruling.  Paying creditors post-petition defeats any incentive those creditors may have to join an involuntary petition because if an order for relief is entered, these post-petition payments are subject to being avoided under § 549.

[137] The four Bos creditors are: TNT Metal Buildings, Inc.; Emerald Coast Association of Realtors; Frazer, Greene, Upchurch & Baker, LLC; and First Capital Bank.  The three LHI creditors are: Frazer, Greene, Upchurch & Baker, LLC; First Capital Bank; and Capital One Bank (USA), N.A.  Bos and LHI listed First Capital Bank as a pre-petition creditor holding a claim for $107,514.86.  Having already ruled that First Capital Bank does not count for numerosity because its claims were either paid in full or contingent at the time of the petitions, *supra*, it is unnecessary to analyze this creditor any further.

contract at any time before installation.  Bos testified that as of the date of the petition the installation was not complete.  Under the terms of the contract, even if TNT, as listed, is the creditor its claim was contingent at the time SEPH filed the involuntary petition.

Emerald Coast Association of Realtors

Bos listed Emerald Coast Association of Realtors as a creditor holding a claim for $547 for "member dues."  The evidence in support of this "claim" comprised of an invoice for 2015 dues dated July 22, 2014 and a document entitled "Member Dues Order" which is undated.  Although the latter document reflects a "balance due" of $547, when compared to the invoice for 2015 dues it appears obvious that the Member Dues Order is not an invoice.  The 2015 dues invoice is labeled "ECAR 2015 Renewal;" it contains the date it was printed, an invoice number, an invoice date and a due date for payment; as well as a legend advising members when the dues are payable and relating other payment information.  The "Member Dues Order" contains none of this.  It is not proof that Emerald Coast Association of Realtors had a claim as of the date of the petition.  In fact, there is no evidence that Bos has (or had as of the petition date) any obligation to renew his membership.  If he doesn't, then he will simply lose the benefits of being a member.  Emerald Coast Association of Realtors will not count towards numerosity.

## Frazer, Greene, Upchurch & Baker, LLC

Bos and LHI listed the law firm of Frazer, Greene, Upchurch, & Baker, LLC ("Frazer") as a creditor holding a claim for $575 for legal services stemming from the SEPH law suit.  The Frazer invoice is dated August 31, 2015, is addressed to both Bos and LHI, and shows "balance last bill" as $575.  The invoice also reflects an adjustment that reduced the amount due to zero.  Based on the weight of the evidence Frazer did not hold a claim on the date of the petition.

## Capital One Bank (USA), N.A. (account ending in 7353)

LHI listed Capital One Bank (USA), N.A. ("Capital One") as a creditor holding a claim for $8,055.15.  Capital One's statement for the billing period ending on August 28, 2015, addressed to both Bos and LHI, shows a credit balance of $2,359.10.  Bos testified that the credit balance was due to Capital One's error and that he really owed money to Capital One.  This testimony was insufficient to overcome the documentary evidence that proved that Capital One did not hold a claim on the petition date.

[THIS SPACE INTENTIONALLY LEFT BLANK]

### Additional Creditors that Did Not Hold Claims on the Petition Date

Three additional creditors listed by LHI, Destin Ice House, Inc., Retail Information Systems and Pro Tech Mechanical Services, Inc., did not hold claims on the petition date and should be excluded from the numerosity count. [138]

### Destin Ice House, Inc.

LHI lists Destin Ice House, Inc. ("Destin Ice") as a creditor holding a claim for $945.44 on account of "invoices for seafood products ordered by LHI for use at Emerald Grand." Although Mr. Knowles testified that this is LHI's debt, the documents do not support this testimony. [139] The Destin Ice invoice was addressed to "Legendary;" the goods were shipped to "Emerald Grand." "Legendary" is not synonymous with LHI. One entity in the Legendary group has a name similar to "Emerald Grand" and two others have names that include "Emerald." [140] The evidence is insufficient to prove that Destin Ice held (or holds) a claim against LHI.

### Retail Information Systems

LHI lists Retail Information Systems ("Retail") as holding a claim for $467. The Retail invoice is addressed to "Legendary Retail." Mr. Knowles testified that

---

[138] The Court has rejected SEPH's argument that these three creditors should be excluded for holding *de minimis* claims. Because these creditors did not hold claims as of the petition date it is unnecessary to address whether they should be excluded on the basis that they received post-petition transfers of property of the estate.

[139] The Court finds Mr. Knowles' testimony as to this creditor to be self-serving on behalf of Alleged Debtors and not credible.

[140] That entity is Emerald Grande Investors, LLC. There are also entities named Emerald LTA-1, LLC and Emerald LTA-2, LLC.

Legendary Retail is no longer in existence, and that LHI owes the obligation. The Court does not find the latter testimony persuasive. The evidence does not support LHI's contention that Retail Information Systems had a claim against it on the date of the petition.

Pro Tech Mechanical Services, Inc.

LHI lists Pro Tech Mechanical Services, Inc. ("Pro Tech") as holding a claim for $539.54. The Pro Tech invoice is addressed to "Harborwalk Marina Legendary," not to LHI.[141]   It was paid post-petition by Destin Marina Services, LLC. "Harborwalk Marina Legendary" is not synonymous with LHI.   One of the Legendary group entities is Harborwalk, LLC.   Multiple entities under the Legendary umbrella have the word "Legendary" attached to their names.   The evidence did not prove that Pro Tech held a claim against LHI as of the petition date.[142]

Generally not Paying Debts as They Become Due

Under 11 U.S.C. 303(h)(1) a court shall order relief only if an alleged debtor is generally not paying his or its debts as they come due.[143]   "The courts apply a flexible totality of the circumstances test in determining whether a debtor is

---

[141] LHI stated in its second amended list of creditors that "the invoice was sent and billed to Harborwalk Marina and Legendary."

[142] As to all three creditors discussed in this section, since LHI is a holding company and the Legendary group entities actually operate the businesses, it is difficult to conceive of LHI being liable for these claims.

[143] 11 U.S.C. § 303(h)(1) ("unless such debts are the subject of a bona fide dispute as to liability or amount.").

'generally not paying' his debts, which focuses on the number of unpaid claims, the amount of the claims, the materiality of nonpayment, and the overall conduct of the debtor's financial affairs."[144]  There is no exact formula for determining whether an alleged debtor is generally not paying its debts; this test is subject to considerable flexibility and judicial discretion.[145]  At least one court has held that where an alleged debtor has failed to pay even one debt that makes up a substantial portion of its overall liability, a court may find that it is generally not paying its debts when they become due.[146]

The $15,005,558.00 that Bos and LHI owe SEPH on account of its final judgment represents the vast majority of the qualifying claims against Alleged Debtors as of the petition date.  Under the case law, that fact is sufficient upon which to rule that Alleged Debtors are generally not paying their debts as they come due.  On the other hand, except for guaranty claims that were contingent upon the petition date, the evidence shows that Bos and LHI are generally paying all of their creditors other than SEPH.  Throughout this case Alleged Debtors have maintained that they have made peace with all of their other creditors.  In his affidavit in support of the motions to dismiss Bos stated:  "As of the date that SEPH filed the Petition, I was

---

[144] *In re Atl. Portfolio Analytics & Mgmt., Inc.*, 380 B.R. 266, 274 (Bankr. M.D. Fla. 2007).
[145] *See, e.g.*, *In re F.R.P. Indus., Inc.*, 73 B.R. 309, 312 (Bankr. N.D. Fla. 1987) (citing 2 Collier on Bankruptcy ¶ 303.12 (15th ed.); *In re B.D. Int'l Discount Corp.*, 701 F.2d 1071, 1075 (2nd Cir. 1983)).
[146] *See In re Fallon Luminous Products Corp.*, No. 09-35581, 2010 WL 330222 at *2 (Bankr. E.D. Tenn. Jan. 20, 2010).

current on all of my payments to all of my creditors except for SEPH.  The only

creditor that I am not paying as agreed is SEPH."[147]  It is for this reason, among

others, that abstention is the best remedy here.

<u>Abstention</u>

Courts have applied different factors in deciding whether or not to abstain

from involuntary cases pursuant to § 305 of the bankruptcy code.  As always, it is

important to start with the statute itself.  Section 305(a)(1) provides:  "The court,

after notice and a hearing, may dismiss a case under this title, or may suspend all

proceedings in a case under this title, at any time if the interests of creditors and the

debtor would be better served by such dismissal or suspension."[148]  Collier states, as

to Chapter 305:

> [S]ome courts have limited the application of § 305(a)(1) to involuntary
> bankruptcy cases and devised the following three-part test for
> abstention:
> 1) the petition was filed by a few disgruntled creditors and most
> creditors oppose the bankruptcy proceeding;
> 2) there is an out-of-court restructuring in progress; and
> 3) the debtor's interests are furthered by dismissal.[149]

Alleged Debtors argue that this Court is "compelled" to abstain because this is

essentially a two-party dispute that would not benefit the creditor body as a whole.

They argue that SEPH has adequate remedies in state court[150] and should not be

---

[147] Bos signed a similar affidavit for LHI.
[148] 11 USC § 305(a)(1).
[149] 2 Collier on Bankruptcy ¶ 305.02[2][a], at p. 305-7 (16th ed. 2015).
[150] *See In re Mt. Dairies, Inc.*, 372 B.R. 623, 634-35 (Bankr. S.D.N.Y. 2007).

enabled to use this Court as a "collection agency."[151]  SEPH counters that abstention would impair its remedies by depriving it of the use of Section 547 of the Bankruptcy Code to set aside the friendly charging orders granted to SSI Destin.  When the petitioner's sole basis for the petition is possible preferential transfers, the court must examine whether the avoidance would benefit the creditor body as a whole, and weigh that benefit against the damage caused to the alleged debtor.[152]

While both parties have good arguments, it is undeniable that this case is, at its heart, a two-party dispute.  The Court does not agree with Alleged Debtors that it is "compelled" to abstain, but the facts suggest that dismissal under the abstention statute is the best remedy for all concerned; especially when applying the test suggested in Collier.  Under that test, we see that SEPH is the only petitioning creditor and that no creditors appeared in opposition to the involuntary petitions.  We also see that Alleged Debtors do not have an out-of-court restructuring with SEPH in progress, but that they have been successful arranging out-of-court restructuring

---

[151] *See id.* (citing *In re Century Tile and Marble, Inc*., 152 B.R. 688, 689 (Bankr. S.D. Fla. 1993).
[152] *Id.* at 226.  The *In re E.S. Prof. Servs., Inc.* court stated:

> Here, despite the petitioning creditor's vague assertion of possible preferential transfers, there seems to be very little benefit to creditors as a whole from the entry of an order for relief. Again, it is the Court's obligation to balance the very real prospect of devastating economic harm to the alleged debtor against the interests of the creditor body as a whole. In this regard, it is important to note that the petitioning creditor already has a forum available to it—namely, the state court lawsuit it filed against the debtor.

That court went on to recognize that at least one court has "specifically rejected the idea that the mere possibility of preferential transfers was sufficient to invoke the 'drastic remedy' of involuntary bankruptcy proceedings," citing *In re Gills Creek Parkway Assocs., L.P.*, 194 B.R. 59, 64 (Bankr. D.S.C. 1995).

of all of their other significant debts.   Unquestionably the interests of Alleged

Debtors would be furthered by dismissal.   Many, if not all, of the entities and

subsidiaries under the Legendary umbrella are still operating successful businesses

and employ more than 500 people.   Bos testified that his and LHI's ability to obtain

or renew credit has been materially impacted by the filing.   Bos may lose a new and

potentially extremely profitable business opportunity as a result of these petitions.

Bos has consistently maintained that putting him and LHI into a Chapter 7, and

keeping them there, could be economically catastrophic.[153]

SEPH's interests will likely not be better served by dismissal.   But the interests

of the petitioning creditor are not included in the three-part test set forth in Collier.

And even if SEPH successfully sets the SSI Destin charging orders aside as

fraudulent transfers under Florida's UFTA,[154] there is no evidence that any member

of the creditor body other than SEPH would benefit.

Some courts consider abstention in a single-creditor involuntary to be an

"extraordinary remedy" to be used sparingly.[155]   Other courts have abstained from

---

[153] If the Court were to enter an order for relief on these involuntary petitions, thus putting Alleged Debtors into a Chapter 7, Bos and LHI could (and likely would) immediately move to convert to Chapter 11.  So, granting these involuntary petitions would not necessarily result in the grim picture that Bos attempts to paint.

[154] § 726 Fla. Stat. (2015).  Although this Court has ruled SSI Destin is an insider, it has not reached the Alleged Debtors' arguments that they were not insolvent when the SSI Destin charging orders were issued, and were not rendered insolvent by those charging orders.  A review of the Affidavits that Bos and LHI filed at the commencement of this case, however, seems to show precisely that.

[155] *In re Manchester Heights Associates*, 140 B.R. 521, 522-23 (Bankr. W.D. Mo. 1992) ("This power of abstention is not reviewable by the courts of appeal.  The power of abstention is, therefore, an extraordinary power which is to be used only in extraordinary circumstances.") (citing to several other bankruptcy court opinions from Minnesota, New York, and New Mexico).

involuntary cases and voiced no hesitation that they might be invoking an "extraordinary remedy."[156]   This dichotomy creates an atmosphere that permits courts great leeway in determining whether or not to abstain with regard to involuntary petitions; especially those that involve, essentially, a two-party dispute. For instance, in *In re Rookery Bay, Ltd.*, a judgment creditor filed an involuntary petition in a single asset case.[157]   All other creditors had agreed to defer collection of their debts.  Upon the alleged debtor's motion for abstention under § 305(a)(1), the bankruptcy court suspended further proceedings in the involuntary until the two-party dispute was resolved in state court.[158]

In *In re Axl Industries, Inc.*,[159] the district court acknowledged that bankruptcy courts generally grant motions to abstain in two-party disputes where the petitioner can obtain adequate relief in a non-bankruptcy forum.  That court considered the motivation of the petitioning creditor, the significance of the alleged debtor's estate, and whether the alleged debtor had engaged in preferential transfers of a significant

---

[156] *In re Axl Industries, Inc.*, 127 B.R. 482 (S.D. Fla. 1991); *In re R.V. Seating, Inc.*, 8 B.R. 663 (Bankr. S.D. Fla. 1981); *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007); *In re Gills Creek Parkway Associates, L.P.*, 194 B.R. 59 (Bankr. D.S.C. 1995).

[157] 190 B.R. 949 (Bankr. M.D. Fla. 1995). (The alleged debtor had appealed the judgment in state court and the appeal remained pending.)

[158] 190 B.R. 949 (Bankr. M.D. Fla. 1995).  Section 305 permits a court to *suspend* proceedings like the Court did in *Rookery Bay*.  *Id*.  Suspension of these proceedings would preserve the 547 preference period while permitting the parties to litigate in state court under Florida's UFTA (*See* § 726.105 & § 726.106 Fla. Stat. (2015)).  Suspension would also signal to Bos and LHI that this Court "gets" what is really going on here.  But, based on the evidence it is clear that suspension would have significant negative impact on Alleged Debtors.

[159] 127 B.R. 482, 484-85 (S.D. Fla. 1991).

portion of its assets.[160]  The *Axl* court recognized that by affirming the bankruptcy court's abstention the petitioning creditor would have to pursue an avoidance action in state court under Florida's UFTA[161] and would lose the benefit of a potential preference action under Section 547 of the Bankruptcy Code. Nonetheless, based on the facts before it the *Axl* court affirmed the bankruptcy court's abstention.[162]

In *In re Mountain Dairies,* the bankruptcy court ruled that it was compelled to abstain pursuant to § 305 because the dispute was a two-party dispute for which the petitioning creditor had adequate remedies in state court.[163]  That court articulated a set of factors that several courts have since used to determine whether the interests of creditors and the debtor would be better served by dismissal or suspension under the abstention provisions in Section 305:

1)  economy and efficiency of administration;

2)  whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

---

[160] *Id.*

[161] § 726.106 Fla. Stat. (2015).

[162] *In re Axl*, 127 B.R. at 485 (recognizing that the Florida UFTA contains an additional requirement that an insider transferee must have had reasonable cause to believe that the debtor was insolvent, the court affirmed the bankruptcy court's abstention.  The alleged debtor had made the transfers to its parent company, making it easier to prove that the insider transferee parent had reasonable cause to believe that its subsidiary, the debtor, was insolvent.)  In *Axl*, the court considered whether the creditor could obtain "adequate" relief in state a non-bankruptcy forum, or as the court in *In re R.V. Seating* put it—whether the petitioning creditor can show it would not obtain as much relief as the Bankruptcy Code provided by proceedings supplementary to its state court judgment. *Id.* at 484-85; *In re R.V. Seating, Inc.*, 8 B.R. 663, 665 (Bankr. S.D. Fla. 1981).

[163] *In re Mountain Dairies, Inc.*, 372 B.R. 623 (Bankr. S.D.N.Y. 2007).

3) whether federal proceedings are necessary to reach a just and equitable solution;

4) whether there is an alternative means of achieving an equitable distribution of assets;

5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

6) whether a non-federal insolvency has proceeded so far that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

7) the purpose for which bankruptcy jurisdiction has been sought.[164]

Like the three-part test set forth in Collier, the seven factors in *Mountain Dairies* suggest that abstention here is the best result.

Factor 1:  Economy and efficiency of administration points towards abstention.  Although liquidation of Bos and LHI's assets might prove valuable, there is no evidence that liquidation would be more beneficial to the general creditor body than allowing the businesses to continue operating.  Chapter 11 would be an alternative to Chapter 7, making a liquidation far from certain.  Additional litigation over these issues could, and under the facts here likely would, prove extremely

---

[164] *See In re 801 South Wells Street, L.P.*, 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996).

costly, not only to these parties but to the entire creditor body.[165]  On the other hand,

proceedings supplementary brought by SEPH in state court should be less costly

and, based on the evidence, would be more beneficial to Bos, LHI and creditors other

than SEPH.

Factor 2:  Another forum is available to protect the interests of SEPH and

another action is already pending in state court.  SEPH's interests may be better

served in this court with the availability of Section 547 of the Code but it is not a

certainty that SEPH would prevail in a preference action.[166]  Further, as in *Axl*,

because the transfers (charging orders) granted by Bos and LHI to SSI Destin were

to an insider, *see supra*, SEPH will have its opportunity to prove the other elements

necessary under Florida's Uniform Fraudulent Transfer Act.[167]

Factor 3:  Federal proceedings are not necessary to reach a just and equitable

solution.  SEPH admits that it filed these involuntary petitions in order to collect

what Alleged Debtors owe and to preserve potential § 547 claims; it will still be able

---

[165] Based on the long and acrimonious litigation history between these parties, if this Court were to grant relief and put Alleged Debtors into Chapter 7, the proverbial race would be on:  undoubtedly Alleged Debtors would immediately move to convert their cases to Chapter 11.  That, in turn, would virtually guarantee SEPH seeking appointment of a Chapter 11 trustee or examiner.  Regardless, the parties would litigate over whether the friendly charging orders granted by Alleged Debtors to SSI Destin are preferential or fraudulent.  There may be no end to the issues these parties could find to litigate here.

[166] Alleged Debtors maintain that they were not insolvent at the time of the transfers, or rendered insolvent as a result of the transfers.

[167] Regardless of whether SEPH and Alleged Debtors litigate over the transfers to SSI Destin, there will still be an issue of whether Alleged Debtors were insolvent at the time of the transfers, or rendered insolvent as a result of the transfers.  § 726.106 Fla. Stat. (2015) and 11 U.S.C. § 547.

to pursue collection in state court.  While federal proceedings could be advantageous to SEPH, it does not appear that such proceedings are "necessary."

Factor 4:  This factor, which is whether there is an alternative means of achieving an equitable distribution of assets, does not apply here.  SEPH is not seeking, nor does there appear to be a need for, equitable distribution of assets.

Factor 5:  Alleged Debtors and all of their creditors other than SEPH have worked out less expensive out-of-court arrangements that better serve all interests except those of SEPH.  Because the interests of other creditors have been met, this factor carries little, if any, weight.

Factor 6:  This "insolvency" has not proceeded so far that it would be costly and time consuming to start afresh without the federal bankruptcy process.

Factor 7:  The purpose for which bankruptcy jurisdiction has been sought. Bos and LHI assert that SEPH filed these petitions in bad faith as a litigation and collection tactic.  SEPH admits that it sought bankruptcy jurisdiction to get paid, but argues that it had no alternative to preserve rights under § 547 in light of the friendly charging orders the Alleged Debtors granted to SSI Destin.  Both sides are in part correct, rendering this factor essentially neutral.

The seven factors enunciated in *In re Mountain Dairies* weigh in favor of abstention.  The reported cases in which courts have struggled with whether or not

to abstain are fact specific.  The facts here show that this case involves a classic two-party dispute that can be dealt with outside of bankruptcy.

Conclusion

Part of this Court's job is to balance the equities; especially in cases like this where the facts and law do not require a clear, specific outcome.  Here, SEPH wants to be paid and Alleged Debtors do not want to pay SEPH.  After encumbering their assets in favor of SSI Destin, an insider, in an obvious attempt to remove their various businesses from SEPH's reach, Alleged Debtors cry foul by accusing SEPH of using these petitions merely as a collection tactic, saying SEPH went too far by filing these involuntary petitions, and demanding that SEPH be ordered to pay them millions of dollars in damages.  But, Alleged Debtors' own actions put SEPH between the proverbial rock and hard place:  either file involuntary petitions to preserve § 547 remedies and face a possible award of attorneys' fees and other damages; or not file the petitions and lose the § 547 remedies forever.  Was SEPH's filing of these petitions risky?  You bet.  Was SEPH emboldened by its victory in the *Stewart* case?  Undoubtedly.  But, SEPH's choice to file the involuntary petitions, under these facts, does not shock the conscience.

In addition to abstaining the Court will deny Alleged Debtors' claims for damages and motions to require SEPH to post a bond.  Each side has suffered enough.  Alleged Debtors have had to endure being in these cases through the date

of this ruling with their financing and normal businesses disrupted. SEPH has still not been paid on its judgment. Both sides have paid and incurred an undoubtedly enormous amount of attorneys' fees.

Abstention puts both parties almost back to where they want to be. Abstention allows Bos and LHI out of bankruptcy, sends SEPH back to state court for collection of its judgment, and does not throw Alleged Debtors' businesses, and thereby the other creditors, "under the bus." Neither side is punished, nor is either rewarded, for its actions prior to or during these involuntary cases.

For the reasons stated, the Alleged Debtors' requests for the Court to abstain pursuant to 11 U.S.C. § 305 will be granted. The Court will enter a separate order consistent with this Memorandum Opinion.

DONE AND ORDERED on ___March 11, 2016_____.


_____
Karen K. Specie
United States Bankruptcy Judge


cc: All interested parties

67

# Appendix to Ruling

Rule: Apply *Denham* to exclude small, recurring claims less than the $275 amount used in *In re Smith*, 123 B.R. 423 (Bankr. M.D. Fla. 1990) (Paskay, J.) and *In re CorrLine Int'l, LLC*, 516 B.R. 106 (Bankr. S.D. Tex. 2014).

| Bos Creditor | Nature of Claim | Claim Amount | Excluded as a non-qualifying creditor? | Reasoning: |
|---|---|---|---|---|
| Hyundai of Metairie | Auto Lease | $318.17 (monthly) | No. | $318.17 is not *de minimis* and exceeds the $275 threshold adopted in *Smith* and *CorrLine*. |
| TD Auto Finance | Auto Lease | $1,230.96 (monthly) | No. | $1,230.96 is not *de minimis* and exceeds the $275 threshold adopted in *Smith* and *CorrLine*. |
| Okaloosa County Tax Collector | Property Taxes | $17,991.87 (but $1,499.32 monthly) | n/a | The Okaloosa County Tax Collector is excluded for different reasons in the Opinion. |
| Lowe's (Synchrony Bank) | Personal Credit Card | $7.61 | No. | $7.61 is small, and personal credit card bills can be considered recurring, but SEPH presented no evidence that the Debt is recurring. |
| Destin Cleaners | Dry Cleaning Services | $111 | No. | SEPH stipulated that the claim is not recurring (Doc. 146, at 3). |
| Dr. Jos Bakker | Dental Services, including a "limited oral evaluation" | $60 | No. | Routine medical services may be considered recurring, but SEPH presented no evidence that this debt is recurring. |

| | | | | |
|---|---|---|---|---|
| Home Team Pest Defense | Pest Control Services and Sentricon Monitoring | $218.30 | No. | SEPH only points to the Creditor list to argue this amount is recurring. The Stipulation states that the nature of the claim is for "maintenance" for pest control services, but SEPH presented no evidence that the debt is recurring. |
| Lisa Jo Spencer, PA | Legal fees for lawyer who has worked for Bos since 2008 | $381 | No. | $381 exceeds the $275 threshold and is not *de minimis*; SEPH argues a bill for regular legal services is properly considered recurring but cites to no evidence of how regularly this debt is incurred. |
| Matthews & Jones, LLP | Legal fees for lawyer representing Bos for 20 years. | $467.50 | No. | $467.50 exceeds the $275 threshold and is not *de minimis*; SEPH argues a bill for regular legal services is properly considered recurring but cites to no evidence of how regularly this debt is incurred. |

| LHI Creditor | Nature of Claim | Claim Amount | Excluded? | Reasoning: |
|---|---|---|---|---|
| Lisa Jo Spencer, P.A. | Legal fees for lawyer who has worked for Bos since 2008 | $381 | No. | $381 exceeds the $275 threshold and is not *de minimis*; SEPH argues a bill for regular legal services is properly considered recurring but cites to no evidence of how regularly this debt is incurred. |
| Destin Ice | Invoices for seafood ordered by LHI used at Emerald Grand | $945.44 | No. | $945.44 exceeds the $275 threshold and is not *de minimis*; although ordered on a house account (Trial Tr. 969:10-12) and a series of invoices make it appear as if this is a recurring debt (Ex Bos-26 at BOS014573-014578). |
| Retail Information Systems | Contract for point of sale and inventory control software | $467 | No. | $467 exceeds the $275 threshold and is not *de minimis*; SEPH states that the payment chart (Ex. SEPH-95) shows this is recurring, but the payment chart does not support SEPH's contention. |
| Pro Tech Mechanical Services, Inc. | Repairs performed on ice machine/freezer; includes parts provided for the repairs | $539.54 | No. | $539.54 exceeds the $275 threshold and is not *de minimis*; SEPH only points to the nature of the claim as "mechanical maintenance" services to prove that the expenses are recurring. |

| CRS Insurance Group, LLC | Services related to minimizing the cost of insurance, maintaining the appropriate exposure date, preparing marketing submissions | $7,000 (Paid in monthly installments of $1,000 (Trial Tr. 417:14-18)) | No. | $1,000 exceeds the $275 threshold and is not *de minimis*. |
|---|---|---|---|---|
| Kirschner & Legler, P.A. | Legal fees for lawyer who has worked for LHI for over 35 years | $807.16 | No. | $807.16 exceeds the $275 threshold and is not *de minimis*; SEPH points only to the lawyer's lengthy service to show that the bill is for "regular legal services" and "recurring." SEPH points to no other evidence to show that the debt is recurring. |
| Allied Insurance | LHI's annual business auto insurance policy for 9/1/15 through 9/1/16—renewed on 8/6/15 for $16,345 | $14,979.92 (invoice shows a minimum amount due October 1, 2015 of $1,502.08 (Ex. SEPH-167 at BOS013374) | No. | $1,502.08 exceeds the $275 threshold and is not *de minimis*; SEPH argues that monthly payments on a business's auto insurance policy are properly considered recurring. |
| Genworth Life & Annuity Insurance Co. | LHI's key man life insurance policy on Mitch Legler, paid quarterly | $2,763.80 ($921.27 monthly) | No. | $921.27 exceeds the $275 threshold and is not *de minimis*; creditor list states that this is paid quarterly, so it can be considered recurring. |